ESTATE of Travis MIXON, Jr., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 1036–S.

United States District Court, M. D. Alabama, S. D.

March 26, 1971.

**978**

Griffith F. Pitcher and James W. Gewin, Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff.

Ira DeMent, U. S. Atty., M. D. Ala., Montgomery, Ala., for defendant.

## DECREE

PITTMAN, District Judge.

This tax refund case has been submitted on a stipulation, depositions, and briefs for decision by the court without jury. The suit involves $126,964.54 in allegedly overpaid taxes, penalties, and interest, this being the amount assessed by the Commissioner against a $140,000 payment from the Bank of Graceville (Florida) to the now deceased taxpayer Travis Mixon, Jr. The taxpayer paid the assessment, filed a timely claim for refund, and brought this action when his claim was not acted on within six months.

This case involves a debt vs. equity question; that is, was the $140,000 payment to the taxpayer repayment of a bona fide debt or was it a return on his invested capital. The following facts appear from the record:

On June 25, 1960, the taxpayer owned 142 (or 14.2%) of the authorized and outstanding 1000 shares of the Bank of Graceville (Bank); he, by attribution under § 318 of the Internal Revenue Code of 1954, owned 153 shares or 15.3% of the stock.

On June 27, 1960, examiners from the FDIC began an examination of the financial position of the bank. They discovered a shortage of nearly $908,000 which was later traced to defalcation by an officer of the bank. Because of the large loss, the FDIC examiner called in a state banking official. The joint examination by the federal and state agents resulted in a determination that through faulty bank practices, the bank had made many improperly secured loans. The examiners ordered some $118,000 of these loans written off. Writing a loan off as uncollectable in no way affects the bank's right to seek collection; it is, rather, an entry on the bank's books which reduces the value of its assets.

The bank and the state bank examiner attempted to get early, partial payment from the bonding company to cover the losses caused by the embezzlement; they were unsuccessful and the bank found itself short of cash. In order to meet an expected run on the bank, caused by public disclosure of the embezzlement, the Board of Directors voted to borrow $200,000 from other banks. A few days later another $100,000 was borrowed from yet a third bank.

Throughout the month of July, the bank attempted to enlarge its endangered assets without incurring short term liabilities: in an effort to attract new depositors the bank began paying interest on time deposits; directors and large depositors were requested to convert savings accounts into certificates of deposit; and, bank officers pushed final settlement with the bonding company. Despite these efforts the position of the bank continued to be tenuous.

On July 21, 1960, Mr. Chapman, the State Deputy Commissioner of Banking, told the directors that $200,000 would have to be injected into the bank to justify his allowing the bank to stay open. The minutes of the board meeting on that date read in part:

"The F.D.I.C. and Mr. Chapman requested that the stock holders add $200,000.00 to the stock of the Bank to strengthen the Bank. The Directors agreed to comply with the request."

At this point it seems clear that the directors envisioned the sale of stock to produce the needed capital. According

to the surviving participants at the meeting, the idea of selling stock was rejected because the small stockholders of the corporation had preemptive rights and the difficulties inherent in a new issue of stock made it an impractical method of raising money quickly.

The method of providing the needed additional funds was arrived at during the directors meeting of July 26, 1960. Because of its importance to the resolution to the present dispute, the formal resolution adopting the funding procedure is reprinted in full in the margin.[1]

Under the terms of the agreement three directors, Travis Mixon, Jr., R. L. Miller, and John R. Mixon would contribute $200,000 to a special account being set up called "Reserve for Contingencies." The bank issued no formal writing indicating that this was a debt. The amount contributed by each director along with his percentage ownership of the bank is as follows:

| | No. of Shares Owned | % of Shares Owned | Amount Contributed |
|---|---|---|---|
| Travis Mixon, Jr. | 153 * | 15.3 | $160,000 |
| R. L. Miller | 20 | 2.0 | 20,000 |
| John R. Mixon | 27 | 2.7 | 20,000 |
| Total | 200 | 20.0 | $200,000 |

* Includes eleven shares attributable to taxpayer under § 318 of the Internal Revenue Code of 1954.

The money deposited by taxpayer in the newly created account was raised by cashing in some certificates of deposit at the bank and by borrowing from a Tallahassee bank; his note at the Tallahassee bank was secured by the pledge of other Graceville Bank certificates of deposit. Subsequently, the pledged certificates were cashed in and the proceeds

1. "WHEREAS, upon recent examination and audit by representatives of the Comptroller of the State of Florida and the Board of Directors of the Federal Deposit Insurance Corporation of Washington, D.C., a severe depletion of the assets on the part of the Bank of Graceville at Graceville, Florida, a Florida Corporation, was discovered, and

"WHEREAS, it has been ascertained by said representatives that the existing reserves of said Bank of Graceville are not adequate and not in accordance with sound banking principles, and

"WHEREAS, the undersigned, as major stockholders and as members of the Board of Directors of said Bank, are greatly concerned with reference to the sound financial condition of said Bank and are desirous of placing said Bank's assets in a position that same complies with good bank practices;

"NOW THEREFORE, for and in consideration of the foregoing recitals, it is jointly and severally agreed between the following, for the benefit of each other and for the benefit of the depositors of said Bank and further for the benefit of the said Board of Directors of the said Federal Deposit Insurance Corporation and said Comptroller of the State of Florida, as follows:

"1. That an account be and the same is hereby established in said Bank of Graceville to be used by said bank as a reserve for contingencies and from which no sums of money shall be withdrawn by any depositor save upon concurrence of a majority of said Board of Directors of said Federal Deposit Insurance Corporation and the said Comptroller of the State of Florida or his duly authorized representatives; it being understood that such consent shall not be given until such reserves are established by said Bank, independent of said sums which will meet the standards of good banking procedures.

"2. That concurrent with the execution of this Indenture, the following named persons shall deposit the following sums to the aforesaid account:

| | |
|---|---|
| Travis Mixon, Jr. | $160,000.00 |
| R. L. Miller | 20,000.00 |
| John R. Mixon | 20,000.00 |

"EXECUTED this 26 day of July, A.D. 1960, in triplicate, at Graceville, Jackson County, Florida.

Travis Mixon, Jr. /S/
TRAVIS MIXON, JR.
R. L. Miller /S/
R. L. MILLER
John R. Mixon /S/
JOHN R. MIXON"

Though the resolution is for the benefit of, *inter alia*, the FDIC's Board of Directors, there is the suggestion that it was actually for the benefit of the Bank of Graceville's board. Mr. Chapman seems to have indicated that if the bank was closed the officers would be held liable for mismanagement.

used to pay the note at the Tallahassee bank.

Over the next few months, the bonding company began paying for the bank's losses; also, many of the loans charged off by the examiners were collected. Despite requests from the bank, however, the examiners refused to authorize any withdrawals from the reserve for contingency fund. The state agent also denied the bank's request to pay interest on the $200,000.

Finally, on April 20, 1961, the state and federal authorities authorized the withdrawal of $50,000 from the reserve for contingencies. By resolution of the Bank's board, the $50,000 was withdrawn on April 26 and distributed as follows:

|  | Amount Contributed | Amount paid on April 26, 1961 |
|---|---|---|
| Travis Mixon, Jr. | $160,000.00 | $20,000.00 |
| R. L. Miller | 20,000.00 | 10,000.00 |
| John R. Mixon | 20,000.00 | 20,000.00 |

It is noted that the payments bore no relationship to the amount originally paid in. Taxpayer got one-eighth of his money, Dr. Miller got half, and John Mixon was paid all of his. At this time the bank was not authorized to pay dividends.

During the following months the bank directors requested release of the remainder of the contingency fund. Finally, on October 26, 1962, the state and federal authorities allowed the remaining $150,000 to be withdrawn. At the same time the bank was authorized to pay up to $10,000 aggregated, in dividends. The $150,000 was distributed to the two remaining contributors. Thereafter the Commissioner of Internal Revenue decided taxpayer's $140,000 was a taxable dividend and the present controversy began.

As noted earlier, this is a debt vs. equity question. Sections 301 and 316 of the Internal Revenue Code of 1954 provide for the taxation of dividends paid by corporations. The money is taxable to the corporation as profits and, after distribution, to shareholders as ordinary income. There is no tax to the individual if the money is merely repayment of a debt; additionally, the interest paid by the corporation is deductible by it as a business expense. There is usually a great tax advantage to the shareholder (and a corresponding disadvantage to the tax collector) when payments to the shareholder can be treated as repayment of a debt. This, of course, is why the debt-equity question is so often litigated.

In deciding whether the money advanced to the corporation is a debt or equity-capital no one test can be used. United States v. Henderson, 375 F.2d 36 (5th Cir. 1967).

Among the factors which may be considered are: (1) whether the money is used to start the corporation; (2) whether repayment is subordinated to other indebtedness; (3) whether there is a fixed maturity date provided; (4) whether the corporation was inadequately capitalized, i. e., "thin"; (5) whether interest was to be paid; (6) whether interest was payable out of earnings only; (7) whether those making the advances got voting power in the corporation; (8) whether advances were made in the same ratio as risk capital; (9) what the intent of the parties was; (10) and the ability of the corporation to obtain outside financing from other sources. Presence or absence of any one of the factors will not cause either party to prevail; rather it is the cumulative weight of these factors and the surrounding circumstances which dictate the prevailing party. Montclair, Inc. v. Commissioner of Internal Revenue, 318 F.2d 38 (5th Cir. 1963). The tests will be taken in order.

(1) If the money in question is being used to start the business the Government's "equity" argument is stronger. Here, however, the bank had been in operation for some years which tends to support the plaintiff's "debt" contention.

(2) No provision one way or the other was made concerning the rights of the

contributors to take before others in the event of liquidation.

(3) There was no fixed maturity date for repayment. This supports the Government's position. This support is weakened somewhat, however, by the testimony that all parties concerned foresaw repayment within two years. This is the time estimated for final settlement of the claim against the bonding company.

(4) Whether the corporation was adequately capitalized, the examiners obviously felt that the bank's position was precarious or they would not have adopted the procedure they did. It appears, however, that the banking authorities were not concerned with the capital versus debt position of the bank. They were worried, apparently, about the liquid assets versus demand deposits. The purpose of the reserve for contingency fund was to improve the bank's short run ability to meet expenses. This is indicated by references to the bank's bad "cash position." The ratio of the bank's invested capital to borrowed capital was not excessive and the court finds that the bank was not "thin."

(5) The bank requested permission to pay interest on the money contributed to the fund; the comptroller refused though the FDIC voiced no objection. While ordinarily failure to pay interest works against the taxpayer's claim, the present case seems, rather, to support it. The FDIC was willing to allow payment of interest, the State comptroller did not base his objections on the grounds that it would amount to a dividend. Also, absence of interest should not defeat taxpayer's claim because of the emergency conditions existing at the time. The money was paid in under pressure from the bank examiners. Taxpayer and the other director-shareholder-contributors did receive interest of a sort when the bank was kept open and they avoided mismanagement charges.

(6) Since no interest was payable, item (6) cannot be applied.

(7) The contributor got no new voting power by virtue of their contribution to the reserve for contingencies.

(8) The funds were not advanced in anywhere near the same ratio as their risk capital.

(9) It seems clear that all parties concerned thought of the money as a loan. The directors indicated this by, among other things, requesting that interest be paid on it. The FDIC seems to have considered it a debt because it offered no objection to interest payments even though the bank still could not pay dividends. The State bank examiner treated the fund as a debt when he authorized repayment of the last $150,000 and at the same time limited dividends to $10,000 aggregate.

(10) The bank had, shortly before creation of the reserve account, borrowed $300,000 from other banks. There is no further evidence as to its ability to obtain outside financing.

■ Based on the above examination it seems clear that the money advanced was a loan, repayment of which is not a taxable event. The court reaches this conclusion primarily because it is obvious that the parties intended to create debtor-creditor relationship; and, since the contributors received none of the usual benefits of an equity investor, the court sees no reason why the parties' intention should not be given effect.

While it is true that indebtedness is not evidenced by any formal, unconditional promise to repay, it does not have to be. There is no fixed maturity date but the evidence is uncontradicted that all concerned anticipated repayment within two years. Like the absence of interest, the lack of a maturity date is also explainable by the emergency existing at the time; the contributors were limited by the banking officials in what they could do.

Based on the foregoing, it is ordered, adjudged, and decreed that the plaintiff recover of the defendant:

(1) The sum of $95,252.78, the amount of overpaid income tax for 1963;

(2) The sum of $4,762.64, the amount of overpaid negligence penalty for 1963;

(3) The sum of $26,949.12, the amount of overpaid deficiency interest for 1963, and,

(4) Interest on the above amounts as allowed by law.

Costs are taxed against the defendant.

