**ESTATE of Travis MIXON, Jr.,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

No. 71-2666.

United States Court of Appeals,
Fifth Circuit.

July 5, 1972.

Ira De Ment, U. S. Atty., Kenneth E. Vines, Asst. U. S. Atty., Montgomery, Ala., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Gilbert An-

drews, Daniel B. Rosenbaum, Harry Baum, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Griffith Pitcher, William Bew White, Jr., James William Lewis, James W. Gewin, Birmingham, Ala., for plaintiff-appellee; Bradley, Arant, Rose & White, Birmingham, Ala., of counsel.

Before THORNBERRY, COLEMAN and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

The frequently litigated issue of whether funds supplied to a business are, in substance, debt or equity and consequently whether reimbursement is to be considered for federal income tax purposes as a loan repayment or a dividend distribution arises once again in the instant case.[1] The instant appeal involves federal income taxes, penalties, and interest for the year 1963 in the amount of $126,964.54. After an assessment in this amount was paid in full by the taxpayer, he filed a claim for refund which was disallowed by the Commissioner. On December 18, 1969, taxpayer instituted this suit in the district court; and on March 31, 1971, judgment was entered in his favor, 324 F.Supp. 977. This appeal by the government followed.[2] Finding no error in the district court's judgment, we affirm.

As in most cases of this type, the facts here are both complicated and significant. As stipulated and found by the district court, they are as follows.

During the period beginning March 8, 1958, and ending January 9, 1963, taxpayer was President and one of five directors of the Bank of Graceville, Florida (the Bank). The authorized capital stock of the Bank consisted of 1,000 shares of common stock having a par value of $100 per share and represented on the Bank's balance sheet by $100,000 in capital stock and $100,000 of surplus. From March 8, 1958 to March 20, 1962, the ownership of the stock was as follows:

| Number of Shares | Name | Relationship to Taxpayer |
|---|---|---|
| 20 | Dr. R. L. Miller | None |
| 142 | Travis Mixon, Jr.[3] | The Taxpayer |
| 11 | Travis Mixon, III | Son |
| 27 | John R. Mixon | Nephew |
| 12 | T. J. Harris | Nephew-in-law |
| 20 | J. M. Cooper | Brother-in-law |
| 81 | J. M. Cooper, Jr. | Nephew |
| 95 | Lena Cooper | Sister |
| 45 | Elizabeth M. Doonan | Niece |
| 10 | Linda D. Doonan | Grand Niece |
| 12 | Mary Frances Harris | Niece |
| 27 | Marie Mixon Hoffman | Niece |
| 120 | J. J. Jones | None |
| 10 | Coker Mixon | Brother |
| 20 | Inez Mixon | Sister-in-law |
| 12 | James T. Mixon | Nephew |
| 12 | Grace Mixon | Grand Niece |
| 115 | P. E. Mixon | Nephew |
| 27 | Ottis Mixon, Jr. | Nephew |
| 27 | Dorothy M. Otto | Niece |
| 95 | Janie M. Price | Sister |
| 20 | R. L. Price | Brother-in-law |
| 10 | Henry Zipperer | Grand Nephew |
| 10 | Lester D. Zipperer | Grand Nephew |
| 10 | Patricia Zipperer | Grand Niece |
| 10 | William Zipperer | Grand Nephew |

1,000 shares

1. This issue has often been considered by this Court. Berkowitz v. United States, 5th Cir. 1969, 411 F.2d 818; Curry v. United States, 5th Cir. 1968, 396 F.2d 630, cert. denied, 393 U.S. 967, 89 S.Ct. 401, 21 L.Ed.2d 375; Harlan v. United States, 5th Cir. 1969, 409 F.2d 904; Tomlinson v. The 1661 Corporation, 5th Cir. 1967, 377 F.2d 291; United States v. Snyder Brothers Company, 5th Cir. 1966, 367 F.2d 980, cert. denied, 386 U.S. 956, 87 S.Ct. 1021, 18 L.Ed.2d 104; Aronov Construction Company v. United States, M.D.Ala.1963, 223 F.Supp. 175, aff'd, 5th Cir. 1964, 338 F.2d 337; Montclair, Incorporated v. Commissioner of Internal Revenue, 5th Cir. 1963, 318 F.2d 38; Campbell v. Carter Foundation Production Company, 5th Cir. 1963, 322 F.2d 827; Rowan v. United States, 5th Cir. 1955, 219 F.2d 51.

2. Jurisdiction is predicated on Title 28, U.S.C.A., Section 1346(a)(1); and Title 28, U.S.C.A., Section 1402(a)(1).

3. The eleven shares owned by taxpayer's son are attributable to taxpayer for income tax purposes under Section 318 of the Internal Revenue Code. 26 U.S.C.A. § 318.

On April 11, 1960, the Office of the Commissioner of Banking for the State of Florida made a routine examination of the Bank's affairs. The examiners found no irregularities and required the Bank to write off only $1,326 in outstanding loans. Less than two and a half months later the Federal Deposit Insurance Corporation (F.D.I.C.), through its examiner Mr. Peoples, made a special examination of the Bank, at which time it was disclosed that J. M. Cooper, Jr., an officer and director had embezzled some $907,000 from the Bank. During July and August of 1960, personnel of the F.D.I.C. and Mr. J. V. Chapman, the Deputy Commissioner of Banking, spent considerable time at the Bank examining its assets and supervising its affairs. The joint examination by federal and state authorities resulted in a further determination that through faulty banking practices, the Bank had made improperly secured loans totalling approximately $118,000. These loans were ordered written off.[4]

In spite of the fact that the Bank had fidelity bonds in the principal amounts of $150,000 and $1,000,000 insuring it against losses resulting from embezzlement, the bank examiners were concerned about the Bank's immediate cash position because of an expected run on the Bank. It was determined that approximately $400,000 in cash was needed to open for business the following day. In order to meet this immediate cash requirement, the Bank obtained $300,000 in loans from other area banks, as follows:

| Date Borrowed | Lender | Amount | Date Repaid |
|---|---|---|---|
| 6/30/60 | Atlantic National Bank (Jacksonville, Fla.) | $100,000 | 9/26/60 |
| 6/30/60 | C & S Bank & Trust Co. (Atlanta, Georgia) | 100,000 | 9/26/60 |
| 7/ 2/60 | First Bank & Trust Co. (Pensacola, Fla.) | 100,000 | 7/29/60 |

Throughout the month of July, the Bank attempted to enlarge its endangered assets without incurring short term liabilities. Taxpayer and other directors made substantial deposits in their personal checking accounts. In an effort to attract new depositors the Bank on July 5, 1960, began paying interest on time deposits; and directors and large depositors were requested to convert their short term savings accounts into longer term certificates of deposits. Bank officers at the same time pushed for a final settlement with the bonding company. Despite these efforts, the position of the Bank remained somewhat tenuous pending collection of the charged-off loans and the fidelity bond.

On July 21, 1960, Deputy Commissioner Chapman of the office of the Forida Commissioner of Banking threatened to revoke the Bank's charter and close its doors unless the directors or stockholders agreed to make $200,000 available to the Bank. He further indicated that if the Bank were closed, its officers, including taxpayer, would be liable for mismanagement. The minutes of the

---

4. The record discloses clearly that charging off a loan does not affect the underlying note's collectibility. A loan is charged off when it fails to conform to sound banking principles. For example, a loan might be charged off if the collateral pledged as security was insufficient or did not meet legal requirements. This would, of course, not in any way indicate that the loan would not be repaid as agreed by the borrower. The banking officials in the instant case readily agreed that a substantial portion of the charged off items would eventually prove to be fully collectible.

Bank's board meeting on that date read in part,

> The F.D.I.C. and Mr. Chapman requested that the stockholders add $200,000.00 to the stock of the Bank to strengthen the Bank. The Directors agreed to comply with the request.

The plan for a new issue of stock was ultimately abandoned because of the Bank's large number of small shareholders with pre-emptive rights. It was determined instead that three of the five directors, Dr. R. L. Miller, John R. Mixon, and taxpayer, would temporarily advance $200,000 to the Bank.[5] This was accomplished pursuant to the provisions of a Resolution-Agreement dated July 26, 1960, which provided that the funds were to be placed in an account designated "Reserve for Contingencies" for the benefit of the Bank, the shareholders, and state and federal banking authorities. No withdrawals could be made without the consent of the Deputy Commissioner and the F.D.I.C.[6]

On July 26, 1960, the contributing directors owned the following percentages of the Bank's stock:

| | No. of Shares | % of Shares Owned | Amount Contributed |
|---|---|---|---|
| Taxpayer | 153[7] | 15.3 | $160,000 |
| R. L. Miller | 20 | 2.0 | 20,000 |
| John R. Mixon | 27 | 2.7 | 20,000 |
| | 200 | 20.0 | $200,000 |

Two directors and the owners of the remaining stock in the Bank made no contribution to the fund.

The Bank's cash position began to improve immediately. By October 4, 1960,

---

5. The $200,000 was derived from the following sources:

(a) $100,000 of the $160,000 the taxpayer agreed to advance came from certificates of deposit which had been issued to him and Katrina Wilder by the Bank.

(b) The remaining $60,000 plus the $20,000 which John R. Mixon and Dr. R. L. Miller each agreed to advance was obtained by their borrowing $100,000 from The Tallahassee Bank and Trust Company, on a note due January 2, 1961, secured by $20,000 in certificates of deposit issued by the Bank to John R. Mixon and his wife, $20,000 in certificates of deposit issued by the Bank to Dr. and Mrs. R. L. Miller, and by $60,000 in certificates of deposit issued by the Bank to taxpayer and his nominees.

6. The Resolution-Agreement provided as follows:

WHEREAS, upon recent examination and audit by the representatives of the Comptroller of the State of Florida and of the Board of Directors of the Federal Deposit Insurance Corporation of Washington, D. C. a severe depletion of the assets on the part of the Bank of Graceville at Graceville, Florida, a Florida Corporation, was discovered, and

WHEREAS, it has been ascertained by said representatives that the existing reserves of said Bank of Graceville are not adequate and not in accordance with sound banking principles, and

WHEREAS, the undersigned, as major stockholders and as members of the Board of Directors of said Bank, are greatly concerned with reference to the sound financial condition of said Bank and are desirous of placing said Bank's assets in a position that same complies with good banking practices;

NOW THEREFORE, for and in consideration of the foregoing recitals, it is jointly and severally agreed between the following, for the benefit of each other and for the benefit of the depositors of said Bank and further for the benefit of the said Board of Directors of the said Federal Deposit Insurance Corporation and said Comptroller of the State of Florida, as follows:

1. That an account be and the same is hereby established in said Bank of Graceville to be used by said Bank as a reserve for contingencies and from which no sums of money shall be withdrawn by any depositor save upon concurrence of a majority of said Board of Directors of said Federal Deposit Insurance Corporation and the said Comptroller of the State of Florida or his duly authorized representatives; it being understood that such consent shall not be given until such reserves are established by said Bank, independent of said sums which will meet the standards of good banking procedures.

2. That concurrent with the execution of this Indenture, the following named persons shall deposit the following sums to the aforesaid account:

| | |
|---|---|
| Travis Mixon, Jr. | $ 160,000.00 |
| R. L. Miller | 20,000.00 |
| John R. Mixon | 20,000.00 |

7. *See* note 3 *supra.*

approximately $28,000 in charged-off loans had been collected. On October 15, 1960, the bonding company paid $473,-388.75 on the Bank's claim. Accordingly, the Bank on October 18, 1960 formally requested permission of Deputy Commissioner Chapman and the F.D.I.C. to withdraw $100,000 from the contingency account to enable the directors to repay a loan at the Tallahassee Bank and Trust Company for the same amount.[8] The Deputy Commissioner chose to deny the request, stating,

> It is true that you are now in an excellent cash position but there are still some loan matters that need to be cleared up.

Thus, at this point, the primary objective of the $200,000—providing temporary operating capital—appears to have yielded somewhat to a secondary objective—ensuring the directors' careful attention to efficient banking procedures.

By the end of 1960, the Bank had received a total of $873,388.75 from the bonding company; and in early 1961 it received an additional payment of $30,000 on its claim, bringing the total cash collection on the bond claims to $903,388.75. After this latter collection on March 8, 1961, the directors again requested permission to withdraw $100,-000 from the account. On April 4, 1961, the Deputy Commissioner agreed to release $50,000; and on April 20, 1961, the F.D.I.C. approved the release. On April 26, 1961, $50,000 was withdrawn from the contingency account and repaid to the directors as follows:

| | |
|---|---|
| John R. Mixon | $20,000 |
| R. L. Miller | 10,000 |
| Taxpayer | 20,000 |

At this time, the Bank was prohibited from paying dividends without the consent of state and federal banking authorities. No request to pay any such dividend had been made; and it is undisputed that the $50,000 withdrawal was charged against the reserve account and had no effect on undivided profits. Distribution of the $50,000 was deter-mined by the director's individual needs at the time of withdrawal. On April 26, taxpayer owned 15.3 percent of the Bank's stock, Dr. Miller owned 2 percent, and John R. Mixon owned 2.7 percent. It is thus clear that the distribution was not pro rata to the directors' percentage stock interests, nor was it proportionate to the advances originally made.

By the end of 1961, substantially all of the charged-off loans had been collected. On July 24, 1962 the Bank requested release of the $150,000 balance in the contingency account and removal of the restriction on payment of dividends. After an F.D.I.C. examination revealed that the Bank's cash position was sound and after a determination by state authorities that correct banking procedures were being followed, consent to release the funds was finally given on November 28, 1962. The Deputy Commissioner at the same time advised the Bank that it could pay dividends not to exceed an aggregate of $10,000 per year. On January 9, 1963, after approval by the directors, the Bank repaid the balance of the advances to taxpayer and Dr. Miller. This payment had no effect on undivided profits and instead served only to abolish the reserve for contingencies account. At the time of repayment, taxpayer owned 40.3 percent of the Bank's common stock.

No payment for interest was ever made on the $200,000 deposit during this period. The possibility of such payments was, however, discussed at the time the deposit was made and from time to time thereafter. On December 27, 1961, the Bank formally requested permission of the banking authorities to pay interest on the funds. Although the F.D.I.C. had no objection to such payments, the Deputy Commissioner denied the request for unexplained reasons.

Congress has seen fit to impose a tax on dividend income received by a stockholder without allowing a corresponding deduction to the payor corporation.[9] On

---

8. *See* note 5 *supra.*

9. *See* 26 U.S.C.A. §§ 301–02, 316.

the other hand, the repayment of a loan or advance by a corporation results in no tax liability to the contributor.[10] As a result of the advantageous treatment accorded loans, stockholders of closely held corporations have preferred to begin operations with a small initial stock investment accompanied by a substantial "loan" of additional funds. *See, e. g.,* Fin Hay Realty Company v. United States, 3d Cir.1968, 398 F.2d 694. This practice, if unrestricted would permit the investor to withdraw corporate funds at a later date without tax incidents. The Internal Revenue Service has justifiably sought to prohibit this practice by characterizing such "loans" as an equity investment in the corporation where appropriate. It is within the context of this understandable conflict between those who seek to minimize their tax liability and the government which would maximize the same that the instant case arises.

Guidelines for determining the "debt versus equity" question have developed by the courts in a number of cases.[11] Decisions in this Circuit have stressed at least thirteen factors which merit consideration in determining this issue. They are:

(1) the names given to the certificates evidencing the indebtedness;

(2) The presence or absence of a fixed maturity date;

(3) The source of payments;

(4) The right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

*See* Indian Lake Estates Incorporated v. Stewart, 5th Cir. 1971, 448 F.2d 574; Tyler v. Tomlinson, 5th Cir. 1969, 414 F.2d 844; Montclair, Incorporated v. Commissioner, 5th Cir. 1963, 318 F.2d 38; Janeway v. Commissioner, 2d Cir. 1945, 147 F.2d 602; Commissioner v. Meridian & Thirteenth Realty Company, 7th Cir. 1942, 132 F.2d 182.[12] The approach of this Court has been to consider all the factors and weigh the evidence favoring characterization of the advance as debt or equity, while realizing that the various factors are not of equal significance and that no one factor is controlling. *See* John Kelly Company v. Commissioner, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946); Dillin v. United States, 5th Cir.1970, 433 F.2d 1097; Tyler v. Tomlinson, *supra;* Aqualane Shores, Incorporated v. Commissioner, 5th Cir. 1959, 269 F.2d 116; Sun Properties v. United States, 5th Cir. 1955, 220 F.2d 171; Commissioner v. T. R. Miller Mill Company, 5th Cir. 1939, 102 F.2d 599. This evaluation presents primarily a question of law, and a district court's determination of the issue is thus subject to de novo re-

---

10. The Code likewise provides for an interest deduction to the corporation as follows:

 General rule.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

 26 U.S.C.A. § 163(a)

11. *See* note 1 *supra.*

12. These factors are by no means all-inclusive. Thirty-eight relevant factors have been used at various times by the courts in determining this issue. *See* Holzman, The Interest-Dividend Guidelines, 47 Taxes 4 (1969).

view by this Court.[13] *See* Berkowitz v. United States, 5th Cir. 1969, 411 F.2d 818; Montclair, Incorporated v. Commissioner, *supra*; Rowan v. United States, 5th Cir. 1955, 219 F.2d 51. We now undertake to perform our function by evaluating the aforementioned factors as they apply to the facts found by the district court.

### (1) The name given to the certificate.

The thrust of this factor is that the court will look to the type of certificate used by the parties in considering the debt—equity question. The issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of a bona fide indebtedness. Montclair, Incorporated v. Commissioner, *supra.* The district court found that the advance here was not evidenced by any formal, unconditional promise to pay. Although the complete absence of any specific evidence of indebtedness might on first blush appear to reveal little about the quality of the transaction, the real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice. *See generally* Nassau Lens Company v. Commissioner, 2d Cir. 1962, 308 F.2d 39. Focusing on this as a factor, a payment to the corporation by a shareholder-director without provision for terms of repayment, interest, and consideration would undoubtedly indicate that the advances were equity bound and intended.

We do not, however, find the lack of such formal evidence dispositive where as here there is other ample evidence that arm's length and normal business standards were applied to the transaction in question. *See* Rowan v. United States, *supra.* We find that the Resolution-Agreement of July 26, 1960, gives the distinct appearance of having been intended to evidence a debt obligation. The resolution, executed by its terms for the benefit of the contributors, the Bank's depositors, and the banking authorities, provided for future withdrawal upon the occurrence of certain well-defined contingencies, all of which were reasonably foreseeable within a short period of time. The record indicates that the Bank recognized its obligation under the Resolution-Agreement. Taxpayer's advance was to be refunded within a reasonably determinable time and, in fact, was repaid out of the same account within the specified time. These facts furnish ample evidence of a fixed obligation and a businesslike, arm's length transaction.

The government seeks to focus our attention on the name given to the account into which the funds were placed and its position in the capital section of the Bank's balance sheet, rather than in the liability section. The government urges that this circumstance indicates that for business purposes the advance was characterized and regarded as a part of the capital structure of the Bank. We reject this analysis. Although the account was referred to as a "Reserve for Contingencies," banking officials agreed that the deposit was misnamed. In ordinary banking usage, a reserve for contingencies is considered to be a part of a bank's primary capital, which is accumulated out of earnings. Such an account is not ordinarily derived from equity advances by directors or shareholders.

The only conclusion discernible from the record is that the deposit was placed in a unique temporary account, and no one knew exactly what it was in

---

13. We do, however, recognize that the factual controversies involved in the case are to be determined by the district court, and we are compelled to affirm these factual judgments if they be supported by substantial evidence. *See* Harlan v. United States, 5th Cir. 1969, 409 F. 2d 904; Diamond Brothers Company v. Commissioner of Internal Revenue, 3d Cir. 1963, 322 F.2d 725; Fed.R.Civ.P. 52(a). We hold only that the ultimate debt-equity issue, based on the facts properly found by the district court, is a question of law.

an accounting sense or what to call it. The government's attempt at characterizing the account by its label or its position on the balance sheet is, under these circumstances, not well taken. *See* Bowersock Mills & Power Company v. Commissioner, 5th Cir. 1949, 172 F.2d 904. Just as labels cannot serve to transform substantive equity into debt, Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; (1935); Rowan v. United States, *supra*, they cannot act to alter the characterization of what otherwise would be considered in substance debt. *See* Harlan v. United States, *supra*.

### (2) Presence or absence of a maturity date.

The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of the same on the other hand would indicate that repayment was in some way tied to the fortunes of the business, indicative of an equity advance. *See* Tyler v. Tomlinson, *supra*. The district court found here that there was no fixed date of repayment expressly provided. This fact was deemed inapposite, however, in view of uncontradicted evidence that all concerned anticipated repayment within two years and the fact that the contributors were limited in their actions by the emergency situation existing at the time of the advance and the coercive influence of the banking authorities.

Taxpayer does not contend that a specific date for withdrawal of the deposit was set. It is contended, however, that the parties contemplated repayment within a maximum of three years, as soon as the bond claim and the charged-off loans were collected. The government disputes the district court's finding of fact to this effect but we find substantial evidence to support it. At the time of the advance, the directors had been advised by the Bank's attorney that the claim against the bonding company was in his opinion fully collectible. This opinion was fully in accord with the judgment of the F.D.I.C. examiner who had expended substantial effort in establishing the validity of the claim. The evidence established that unlitigated claims against bonding companies are generally paid within one year and even if litigation were involved, the claim would be collected within three years. All parties concerned recognized that the charged-off loans would eventually prove to be collectible, probably within two years.[14] Moreover, the fact that the advances were in fact repaid within two and one-half years of the funding indicates that an early maturity date was contemplated even in the absence of a fixed agreement. Harlan v. United States, *supra* 409 F.2d at 909.

The government contends that the evidence fully establishes that repayment was not automatic upon collection of the loans and the bond claim. This would tend to indicate that reimbursement was tied to the financial fortunes of the business. By October 18, 1960, the bulk of the bond claim had been collected. In spite of this, on November 2, 1960, Deputy Commissioner Chapman refused the directors' request for reimbursement from the contingency fund on the ground that the Bank was holding a large group of mortgages of questionable legal validity. In April 1961, repayment of only $50,000 from the fund was authorized because, in the opinion of the banking officials, the Bank's procedures still failed to comply with legal requirements and a large amount of loans were still outstanding. Moreover, there is evidence that Deputy Commissioner Chapman considered the Bank's earnings and profits for the current year before consenting to the release of the fund.

It would thus appear from the record that the financial health and stability of the Bank were at least factors in the decisions of when and whether to return the fund to the contributors. Also apparent, however, is that the only circum-

---

14. *See* note 4, *supra*.

stances separating the Bank from sound financial ground were collection of the bond claim, collection of the charged-off loans, and the bank officers' institution of sound banking principles. The collections were almost inevitable within a three year period, and maintenance of responsible banking practices was within the unfettered control and discretion of the Bank's directors, who had every reason to maintain such practices as soon as possible under the circumstances.

In Dillin v. United States, *supra,* wherein the advances were in the form of demand notes, the Court found the absence of a fixed maturity date despite the fact that repayment was contemplated as soon as the corporation went public. The government contends that the contemplation of the parties is thus not equivalent to a binding contractual maturity date. We have no doubt that this is ordinarily true. In *Dillin,* however, the decision of whether or not to go public was within the unbridled discretion of the stockholders, the same individuals who held the notes. In the instant case, the only discretion left to the directors to delay reimbursement beyond the reasonably determinable three-year period was the choice of whether to maintain sound banking practices, a legal obligation that we cannot assume would be disregarded. Within this framework, we find more than substantial evidence to support the trial court's judgment that reimbursement was reasonably contemplated within a short time of the advance, which fully supports the ultimate finding that the advance was in the nature of a loan.

### (3) The source of the payments.

▮▮▮▮▮ The district court did not directly consider this factor, the import of which is that if repayment is possible only out of corporate earnings, the transaction has the appearance of a contribution of equity capital but if repayment is not dependent upon earnings, the transaction reflects a loan to the corporation. *See* Harlan v. United States, *supra.*[15] In the instant case, repayment was tied to strengthening the bank's capital account through improvement in its surplus accounts. Taxpayer could thus look only to the Bank's surplus accounts for repayment, and when in fact the advances were repaid, the Bank's balance sheet indicated a decrease in the *capital* section of the balance sheet. These facts would appear to support an equity characterization of the transaction. We, however, find otherwise here. Unlike most other cases, even those in which a debtor-creditor relationship has been found, the source of repayment in the instant case was without question not earnings or profits. It cannot be seriously disputed that the source of the repayment to taxpayer was the cash generated by the collection of the bond claim and collection of the charged-off loans. These collections had no effect on the Bank's earnings. The government's reliance on mere labels in contending that the source of repayment was an increase in the capital accounts, which normally results from an earnings increase, is not persuasive where, as here, the source of the capital increase was without doubt something other than earnings.

### (4) Right to enforce repayment.

▮▮▮▮▮ If there is a definite obligation to repay the advance, the transaction would take on some indicia of a loan. Campbell v. Carter Foundation Production Company, 5th Cir.1963, 322 F.2d 827. The government contends that repayment was solely within the unfettered discretion of state and federal banking authorities, and that the directors would have had no recourse against the Bank in the event of default. We disagree. Although repayment was dependent on collection of the bond claim and the charged-off loans, it was not dependent on the "success of the business" as that phrase is ordinarily used. Repayment was conditioned on

---

15. This factor is somewhat anomalous in view of the fact that the majority of bona fide loans are likewise repaid out of earnings.

reasonably foreseeable events, which could almost be characterized as events certain. The only real uncertainty in the collection was a matter of "when" rather than "whether". It is uncontradicted that taxpayer expected to be repaid and that the banking authorities contemplated repayment. The record establishes with little doubt that all parties involved did not consider the advance as providing permanent capital financing, which is ordinarily derived from equity advances, but rather temporary working capital to meet what was thought to be, and what proved to be, a temporary emergency. Once the determinable conditions were met, we have little doubt that the Bank was legally obligated under general principles of creditors' rights to return the funds. *See* Clark v. Boston-Continental National Bank, D. Mass. 1936, 9 F.Supp. 81; Binns v. First National Bank, 367 Pa. 359, 80 A.2d 768 (1951); State ex rel. Gordon v. Trimble, 318 Mo. 341, 300 S. W. 475 (1927).

### (5) Participation increase in management.

The district court found, and the government concedes, that the contributors were not granted any increased voting power or participation in the Bank's affairs by virtue of the advance. This fact serves as cumulative evidence that the advances here involved were loans, rather than risk capital.

### (6) Subordination.

Whether the advance has a status equal to or inferior to that of regular corporate creditors is, of course, of some import in any determination of whether taxpayer here was dealing as a shareholder or a creditor. *See* Tomlinson v. The 1661 Corporation, 5th Cir. 1967, 377 F.2d 291; United States v. Henderson, 5th Cir. 1967, 375 F.2d 36; United States v. Snyder Brothers Company, 5th Cir. 1966, 367 F.2d 980; Montclair, Incorporated v. Commissioner, *supra*; Rowan v. United States, *supra*; Bittker & Eustice, Federal Income Taxation of Corporations & Shareholders

123 (2d ed.). The fact that an obligation to repay principal is subordinate to claims of other creditors does not, however, necessarily indicate that the purported debt is in reality an equity contribution, especially where the advance is given a superior status to that of other equity contributions. Harlan v. United States, *supra*; Tomlinson v. The 1661 Corporation, *supra*.

In the instant case it is not at all clear where the advance stood on the preference scale. Certainly there was no provision for express subordination as can be found in other cases. *See, e. g.,* Wanamaker Philadelphia v. Commissioner of Internal Revenue, 3d Cir.1943, 139 F.2d 644; First Mortgage Corporation v. Commissioner of Internal Revenue, 3d Cir.1943, 135 F.2d 121. The government urges that the advance was necessarily subordinate to other debt because it was listed in the capital section of the balance sheet. This is clearly not so. Harlan v. United States, *supra*; Bowersock Mills & Power Company v. Commissioner of Internal Revenue, *supra*. In addition, the government can only point to legal opinions rendered by state and federal banking authorities as to the status of the advance. These officials agreed that in their opinion the fund upon liquidation would have stood on equal footing with other shareholders. Although this legal opinion by the examiners recognized as experts in their particular field, are quite interesting, we do not find them the least bit controlling. Nor do we find that they require reversal here. The government has cited no cases supporting their position that taxpayer's advance was clearly subordinate to the loans of other creditors of the Bank. We thus find ourselves unable to utilize this factor to support a reversal of the district court's judgment where as here the status of the advance, vis-a-vis other creditors, is at least not free from legal doubt.

### (7) Intent of the parties.

The government challenges the district court's consideration of the tax-

payer's intent to make a loan. There is little doubt, however, that intent, at least where the facts are ambiguous, is to be considered in adjudicating any debt versus equity question. The real problem here is in the government's failure to distinguish between subjective and objective intent. We agree that the parties' intent to create either a debt or equity relationship is, in a sense, the ultimate issue to be determined here. In United States v. Snyder Brothers Company, *supra*, this court, quoting language from Kraft Foods Company v. Commissioner of Internal Revenue, 2d Cir.1956, 232 F.2d 118, stated:

> We think the problem is not one of ascertaining "intent", since the parties have objectively manifested their intent. It is a problem of whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes. 367 F.2d at 982–983.

 This stands only for the principle, well-recognized in all areas of the law, that a *subjective* intent on the part of an actor will not alter the relationship or duties created by an otherwise objectively indicated intent. *See* Dillin v. United States, 5th Cir.1970, 433 F.2d 1097–1100. Judge Goldberg states the proposition thusly:

> Tax law requires that creditorship have genuine existentiality. (citation omitted) This requires more than a declaration of intention to create an indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclature captions.

Tyler v. Tomlinson, *supra*, 414 F.2d at 850.

This is in no way contrary to the proposition that in cases in which the outward signs, i. e. the objective facts of the case, are ambiguous and do not result in a clear manifestation of objective intent, then subjective intent is relevant on the issue. Judge Goldberg, in Tyler v. Tomlinson, *supra*, pointed out.

If appellants mean to say that a mere showing of an intent to create an indebtedness and the existence of something called "notes" is sufficient to take their case to the jury, we must disagree. If that were true, every debt-equity case would require a jury verdict no matter how transparent the attempt at tax avoidance. We therefore look not to mere labels or to the self-serving declarations of the parties, but to the more reliable criteria of the circumstances surrounding the transaction. If none of these circumstances are in dispute, there is no jury question. As this court recently observed: "It is not the jury's function to determine whether the undisputed operative facts add up to debt or equity. This is question of law." 414 F.2d 850

Within the confines of this case, wherein the objective signs point in all directions, there is no doubt that the district court was correct in looking to the subjective intent of the parties to ascertain the correct direction to follow.

In the instant case taxpayer contends, and the government concedes, that the directors subjectively intended the advances to be loans to the Bank. The minutes of the Bank's board of directors' meetings, the Bank's correspondence with banking authorities and the directors' request to receive interest on the advance, as well as the constant requests for repayment, indicate almost conclusively that, at least within the confines of their own minds, the directors were only loaning the funds to the Bank.

The government argues, however, that the banking authorities' intent was to increase the equity capital accounts. This is evidenced, or so it is contended, by (1) the examiners' opinion that the fund was subordinate to the rights of other Bank creditors, (2) their placing the funds in the capital section of the balance sheet, (3) their request for a new issue of stock to raise funds, and (4) their constant reference to the need of the Bank for capital funding. As-

suming that the examiners' intent is relevant here, the first two factual allegations have previously been deemed somewhat inconclusive. With reference to the banking authorities request for a new issue of stock, examination of the facts work contrary to the government's position. Although the directors initially agreed to the request for a new issue, the plan was ultimately abandoned for legitimate business reasons. It is undisputed that the new issue was not initiated because of the large number of small shareholders who would be required to participate. This method of raising cash would have, in the directors' opinion, been costly and time-consuming and would have worked a hardship on the smaller shareholders. Instead of a stock issue, the Resolution-Agreement was passed, which clearly intimated a desire to regain the funds as early as the examiners deemed feasible. The banking authorities did not then voice objection that the real need of the Bank was for permanent capital financing, evidenced by shares of stock. Rather the authorities readily agreed for the apparent reason that this method of providing funds, while expressly temporary and evidencing a loan, was fully adequate to meet the needs of the Bank. It is true that the examiners repeatedly emphasized the Bank's need for capital funds. Within the context in which they were speaking, however, it is quite clear that they were referring to working capital, rather than permanent financing. Their essential purpose was to acquire and restrict sufficient funds to meet the operating needs of the Bank until the immediate crisis was over. Repayment was clearly contemplated upon the collection of the bond claims and the charged-off loans. The facts are thus not inconsistent with the intent to form a debtor-creditor relationship. Rather they are entirely consistent with such an intent.

(8) Thin or adequate capitalization.

■ We have noted before that thin capitalization is very strong evidence of a capital contribution where (1) the debt to equity ratio was initially high,

(2) the parties realized the likelihood that it would go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to *commence* operations. United States v. Henderson, *supra*. We note the absence of such circumstances in the instant case and recognize the insignificance of this factor in their absence. *See* Rowan v. United States, *supra*; Tyler v. Tomlinson, *supra*. *See also* Berkowitz v. United States, *supra*.

The district court found that the Bank's capitalization was not thin. The government contends, however, that capitalization was clearly inadequate because the very purpose of the advances was to prevent the government from closing down the bank for lack of capital. We find substantial evidence to support the district court's finding of fact and very little to sustain the position of the government. The evidence clearly establishes that at the time the $200,000 was advanced, the Bank's capital was adequate for purposes of the federal income tax laws. All persons concerned, the directors as well as the F.D.I.C. and state authorities, testified that the Bank's equity capital was adequate on the date of the advance. It is virtually undisputed that had the bonding claim been collected prior to July 26, 1960, there would have been no need for the advances. What is therefore shown is that the directors and examiners were faced with a temporary cash shortage, a situation that could be remedied only by an influx of cash, whether coming in the form of equity or debt. The directors of the Bank responded to the need by (1) causing the Bank to borrow $300,000 from other banks, (2) making substantial deposits in their checking accounts, (3) encouraging friends, relatives, and associates to make deposits, (4) authorizing interest-bearing savings accounts, (5) transferring certain demand deposits to time deposits, and (6) placing the $200,000 in the restricted account. All of these methods generated immediate, temporary working capital, i.

e., cash. We trust that the government would concede that all but the advance involved here created a corresponding indebtedness and did not cause an increase in capital. The government, however, would have us hold that these other methods of generating cash were for the purpose of improving the temporary cash shortage; whereas the instant advance was purposed to replenish allegedly inadequate equity capital accounts. We find no merit to any such contention.

### (9) Identity of interest between creditor and stockholder.

■ The district court found, and the government concedes, that the funds advanced were not in proportion to the directors' risk capital. If advances are made by stockholders in proportion to their respective stock ownership, an equity capital contribution is indicated. Tomlinson v. The 1661 Corporation, *supra*. A sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is, however, strongly indicative that the debt is bona fide. Tyler v. Tomlinson, *supra*; Berkowitz v. United States, *supra*; Charter Wire, Incorporated v. United States, 7th Cir.1962, 309 F.2d 878, cert. denied, 372 U.S. 965, 83 S.Ct. 1090, 10 L.Ed.2d 129; Leach Corporation v. Commissioner of Internal Revenue, 30 T.C. 563, 579 (1958).

At the time of the advance here involved, taxpayer owned directly and by attrition 15.3 percent of the Bank's stock. By contrast, he advanced 80 percent of the fund. John R. Mixon owned only 2.7 percent of the stock but advanced 10 percent of the total amount. Miller owned only 2 percent of the stock and likewise advanced 10 percent. The remaining stockholders, owning 80 percent of the Bank's stock, advanced none of the money. It is obvious that ordinary shareholders, especially a 15 percent shareholder as was taxpayer here, would not be inclined to advance funds to their corporation without recourse and without requiring the same of their

fellows. Such payments bearing absolutely no relation to the shareholders' pro rata ownership clearly are completely inconsistent with characterization of the advance as a capital contribution.

### (10) Payment of interest only out of dividend money.

■ As the district court noted, there was no provision for the payment of interest on the advance. The government argues that this fact alone militates strongly against a finding that the advance was a loan. It is true, as this court stated in Curry v. United States, 5th Cir.1968, 396 F.2d 630, that "a true lender is concerned with interest". *See also* National Carbide Corporation v. Commissioner of Internal Revenue, 336 U.S. 422, 435 n.16, 69 S.Ct. 726, 93 L.Ed. 779 (1949). The failure to insist on interest payments ordinarily indicates that the payors are not seriously expecting any substantial interest income, but are interested in the future earnings of the corporation or the increased market value of their interest. Curry v. United States, 396 F.2d at 634.

■ We agree that the lack of provisions for the payment of interest indicates that the monies advanced here were intended as a contribution to equity capital, rather than an arm's-length debt obligation. In the circumstances of the instant case, however, the thrust of this factor is blunted to a significant extent. It is clear here that the form of the transaction was dictated by the F.D.I.C. and Deputy Commissioner Chapman. The Bank at the time of this advance was operating under the strict control of state and federal banking authorities who made it quite clear that they would close the Bank if their suggestions were not followed. The relationship between the depositors and the Bank was thus far different from the relationship between the ordinary closely held corporation and its shareholder-directors. The banking authorities in effect imposed an arm's-length standard, or the lack thereof, upon the action taken by the directors. We cannot say, un-

der such coercive circumstances, that the failure to demand interest before advancing the money clearly indicates the intent to contribute risk capital.[16] Secondly, it is undisputed that taxpayer and the Bank actually requested permission to pay interest on the advance. The F.D.I.C. officials had no objection to paying interest and recognized the propriety of such payments, but the state authorities refused the request for undisclosed reasons. Taxpayer was in no position to argue. The point is, however, that no one suggested at the time that such interest payments would be impossible because the advance was an equity contribution rather than a loan. These facts warrant our holding the failure to require interest payments to be insignificant.

### (11) Ability to obtain loans from outside lending institutions.

If a corporation is able to borrow funds from outside sources at the time an advance is made, the transaction has the appearance of a bona fide indebtedness. Tomlinson v. The 1661 Corporation, *supra*. The purpose of this inquiry is obviously to test whether the shareholder contributors acted in the same manner toward their corporation as ordinary reasonable creditors would have acted. If no reasonable creditor would have loaned funds to the corporation at the time of the advance, an inference arises that a reasonable shareholder would likewise not so act. The district court, in holding that the Bank had not reached its outside credit limits at the time of the advance, cited the fact that three outside institutions had loaned $300,000 to the Bank just prior to the advance. Although this fact is not fully determinative of this issue, we find substantial evidence to support the lower court's judgment. Moreover, we find no evidence in the record tending to support the government's position. There was no evidence that the Bank made any unsuccessful attempts at further outside financing. On the contrary, all such efforts proved successful. In addition, the Bank had a $900,000 asset in the bond claim at the time, which, with little doubt, could have been pledged as collateral for substantial loans. The record indicates conclusively that the reason for borrowing from the directors was not that the Bank had reached its credit limit but rather that the banking authorities deemed it necessary to require a declaration of faith by the directors in order to ensure proper attention to the Bank's operations.

### (12) The extent to which the advance was used to acquire capital assets.

### (13) The failure of the corporation to repay on the due date.

Both these factors support the district court's characterization of the advance as creating a bona fide indebtedness. The advance was without question utilized to provide working capital for the day-to-day operations of the Bank and was in no way connected to any acquisition of capital assets. Moreover, it is clear that the Bank repaid the advance as soon as the conditions previously discussed were met.

The foregoing factors indicate almost conclusively that the district court was correct in holding the advance herein involved to be a bona fide loan. We recognize that this case presents a peculiar situation, wherein all the usual indicia of a legitimate indebtedness are not present. It is clear, however, that here the intent of the directors and the needs of the Bank were for temporary cash advances. The advance was to be repaid within a reasonably determinable time period as soon as the temporary cash shortage was remedied by collection of the bond claim and the charged-off loan,

---

16. Judge Ainsworth in Dillin v. United States, 5th Cir., 433 F.2d 1097, intimated that proof of an economic motive for failing to require interest payments would not suffice to destroy this factor's import.

This is in no way contrary to our holding here—that coercion by legal authorities may be considered to mitigate the effect of the failure to pay interest.

the occurrence of which was virtually assured. All indications that the advance constituted a contribution to equity capital were the result of the then existing emergency situation and the coercive influence of the state and federal banking authorities, who were successful in imposing a less than arm's-length bargain on the directors. The government would have us hold that a 15 percent shareholder, taxpayer here, advanced 80 percent of a capital contribution to his corporation with all its attendant risks and with no thought to acquiring interest, greater control over the corporation, a greater ownership percentage, a like contribution from other shareholders, or even an assurance that the advance would be returned. The facts, and our opinion that corporate directors are generally reasonably intelligent, dictate otherwise. Under such circumstances, we cannot say the district court erred in its judgment that the advance lacked the ingredients of high-risk capital investment.

Affirmed.