RACAL ELECTRONICS INC. and SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Racal Electronics, Inc. v. Commissioner
Docket No. 6226-87
United States Tax Court
T.C. Memo 1990-494; 1990 Tax Ct. Memo LEXIS 547; 60 T.C.M. (CCH) 756; T.C.M. (RIA) 90494; September 13, 1990, Filed Decision will be entered under Rule 155. Dan M. Burt, Henry B. Miller, and David G. Tripp, for the petitioner. Gary F. Walker and Eric B. Jorgensen, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, JUDGE: By notice of deficiency dated December 12, 1986, respondent determined the following deficiencies in petitioner's Federal income tax: Tax Year
Ended Deficiency
3/31/78
$   699,569.00
3/31/81
1,078,098.00
3/31/82
306,946.00
3/31/84
7,703,022.00
The issues remaining for decision [1] *548 are: (1) whether advances made by petitioner to its then partially owned subsidiary were loans or contributions of capital, and if they were loans, whether petitioner is entitled to a bad debt deduction for its forgiveness of the loans; and (2) whether petitioner is entitled to deduct pursuant to section 162 [2] payments made by one of its subsidiaries on behalf of another, and if not, whether the advances were loans so that petitioner is entitled to a bad debt deduction for its forgiveness of the loan. FINDINGS OF FACT 1. Background
Some of the facts of this case have been stipulated and are so found. The stipulation of facts, additional stipulations of fact, and additional stipulations of fact no. 3, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner is an affiliated group of corporations of which Racal Electronics, Inc. (REI), is the common parent. REI, a Delaware corporation, maintained its principal office in Boca Raton, Florida, when it filed its petition. Petitioner filed consolidated Federal tax returns for the years at issue. (REI and all the other companies included in its consolidated returns shall hereinafter be referred to collectively as the REI Group.) REI is wholly owned, indirectly, by Racal Electronics PLC (REPLC), a publicly held United Kingdom corporation. (All the corporations owned directly or indirectly by REPLC *549 throughout the world shall hereinafter be referred to collectively as the REPLC Group.) The REPLC Group is comprised of approximately 100 subsidiary companies worldwide, most of which manufacture professional electronics products for various commercial and government customers. During the years at issue, the REI Group filed its tax returns on the accrual method of accounting and on a fiscal year basis, with the fiscal year ending March 31. The REI Group kept its books and records on the basis of 13 accounting periods, having 28 days each, comprising its fiscal year. (These periods shall hereinafter be referred to as P-1, P-2, P-3, through P-13.) The Racal Corporation, formerly Racal Holdings, Inc., formerly Racal-Milgo Electronics Corporation, is a wholly owned subsidiary of REI and a part of the REI Group. (The Racal Corporation shall hereinafter be referred to under its former name, Racal Holdings, Inc. (RHI).) 2. RHI's Acquisition of Vikonics, Inc.
During the 1970's, REPLC expanded its business in the United States through its acquisition of several companies. During these formative years, REPLC's "main board" directors supervised its United States operations. In 1979, Geoffrey *550 Lomer (Lomer), technical director on REPLC's main board, first learned of Vikonics, Inc. (Vikonics). At all relevant times, Vikonics was a New York corporation. At that time, Vikonics manufactured and marketed large nonresidential custom-designed systems for security and area access control, an area in which the REPLC group was interested. In mid-1979, Lomer met with John L. Kaufman (Kaufman), Vikonics' president and sole shareholder. Kaufman impressed Lomer, an engineer by training, with his technical expertise in the field of area access control. Lomer was also impressed by Kaufman's ideas for extending his technical expertise into the field of factory data collection. Thereafter, Lomer and Kaufman visited the United Kingdom offices of Sperry Univac (Sperry), a large computer and data processing company. The Sperry officials were considering whether to develop a factory data collection system of their own or whether to adopt Kaufman's. Lomer and Kaufman began negotiating for the REI Group's acquisition of an interest in Vikonics. During these negotiations, the parties discussed the REPLC Group's desire to have Vikonics diversify its product line and convert some of its custom-made *551 security systems into "off-the-shelf" products, which could be sold by other members of the REPLC Group. On November 9, 1979, Racal-Milgo Electronics Corporation (the predecessor of RHI), Vikonics, and Kaufman entered into a Stock Purchase Agreement (purchase agreement). Prior to that date, Kaufman owned all 200 of the issued and outstanding shares of Vikonics. Pursuant to the purchase agreement, RHI acquired from Kaufman 60 of the 200 outstanding Vikonics shares at $ 4,000 a share, for a total of $ 240,000. Also pursuant to the purchase agreement, RHI acquired 200 shares of authorized but unissued Vikonics stock at $ 4,000 per share, for a total of $ 800,000. Vikonics' audited financial statements reflected total stockholders' equity of $ 320,013 as of August 31, 1979. Accordingly, RHI's purchase of the unissued shares on November 9, 1979, increased Vikonics' capital accounts by $ 800,000, for a total of $ 1,120,013. After executing the purchase agreement on November 9, 1979, RHI owned 65 percent of the then outstanding shares of Vikonics stock, with Kaufman owning the remaining 35 percent. The purchase agreement also required RHI to purchase Kaufman's remaining shares of Vikonics *552 stock over a period of time from 1984 to 1987 at a price based on Vikonics' future profitability. The purchase agreement further allowed REPLC to elect the chairman of the board of directors and all but one of the board of directors of Vikonics until RHI exercised its option to purchase the remaining 35 percent interest. Kaufman remained president of Vikonics after RHI's acquisition, and Lomer became chairman of Vikonics' board of directors. Thereafter, Vikonics changed its name to Racal Vikonics, Inc. (Racal Vikonics). For petitioner's taxable years ending March 31, 1981, March 31, 1982, and March 31, 1983, Racal Vikonics was not a part of an "affiliated group" of corporations with RHI or REI within the scope of section 1504(a) and thus was not included in the REI Group consolidated returns. 3. Advances by Racal Finance Limited to Racal Vikonics
Racal Finance Limited (RFL) is a United Kingdom subsidiary of REPLC which serves as a banking company for the REPLC Group. RFL maintains more than $ 100 million in deposits from REPLC Group companies. At all relevant times, RFL's function was to accept deposits from REPLC Group companies and loan funds back out to the REPLC Group for *553 day-to-day expenses. RFL always charged borrowing companies interest for these loans, normally at 1 percent above the Bank of England's minimum lending rate (generally the equivalent of the prime rate in the United States). RFL always accrued and reported this interest income on its financial statements and tax returns. RFL did not make any capital contributions to any member of the REPLC Group, nor did it contribute to the equity of any of the REPLC Group. In effect, RFL's loans to the REPLC Group companies were similar to revolving lines of credit issued by banks. RFL's lending function reflected REPLC's corporate policy that its subsidiaries were not normally permitted to borrow money from outside sources. The stock purchase agreements through which REPLC acquired its subsidiaries, including Racal Vikonics, contained a standard provision granting it the option to require its subsidiaries to obtain loans from RFL. The first time RFL lent funds to a REPLC Group company it would, as a standard practice, send the borrowing company a lending letter stating the terms of repayment and interest. RFL made subsequent advances on the same basis. In March 1980, Kaufman projected to Lomer *554 that Racal Vikonics would have prefinance profits of $ 1,213,000 for fiscal year ending March 31, 1981. In April 1980, Kaufman sought a $ 500,000 line of credit from Manufacturers Hanover Trust Company (Manufacturers Hanover) in New York. On April 18, 1980, Manufacturers Hanover wrote Lomer offering to lend Racal Vikonics $ 500,000 and further requesting that REPLC guarantee the loan. REPLC did not guarantee the loan, however, and instead directed Kaufman to borrow the needed funds from RFL. On May 2, 1980, Kaufman, as Racal Vikonics' president, requested and obtained Racal Vikonics' first advance from RFL in the amount of $ 200,000. In accordance with RFL's standard practice, Gerald John Bustin (Bustin), RFL's financial comptroller, sent a lending letter to Racal Vikonics, setting forth the following terms of repayment and interest charges: U.S. $ Loan
I have arranged a transfer of funds of $ 200,000 from Barclays Bank International, London to Manufacturers Hanover Trust, for the credit of Vikonics Inc., value today, 2nd May. This should be reflected in your books as a loan from Racal Finance Limited and as such, will be subject to an interest charge. The basis of the charge *555 is prime U.S. Rate Loan in the Wall Street Journal each Monday, and, interest will be calculated weekly and charged to Racal Vikonics Inc. each period. [Emphasis added.]
In the ten months following RFL's initial advance, Racal Vikonics requested and received the following additional 19 advances: Date
Amount
May 30, 1980
$ 200,000
June 24, 1980
250,000
July 31, 1980
100,000
August 21, 1980
100,000
September 1, 1980
100,000
September 4, 1980
100,000
September 12, 1980
150,000
September 26, 1980
80,000
October 2, 1980
85,000
October 16, 1980
75,000
October 31, 1980
50,000
November 12, 1980
80,000
November 18, 1980
275,000
December 5, 1980
150,000
December 10, 1980
112,000
December 19, 1980
92,000
January 15, 1981
185,000
February 13, 1981
194,000
March 17, 1981
160,700
Total
$ 2,538,700 Including its initial May 2, 1980, advance of $ 200,000, RFL's advances to Racal Vikonics totaled $ 2,738,700. Racal Vikonics used these advances to pay its normal operating expenses, rather than for capital acquisitions. RFL and Racal Vikonics recorded the advances on their respective books and records as loans. Racal Vikonics also reported the advances as loans in its correspondence with REPLC as well as in its periodic reports. In addition, *556 Racal Vikonics' controller, Robert Levine, asked REPLC in September 1980, to confirm the following for purposes of an independent financial audit: "Our records indicate a balance of $ 950,000 (U.S.) owing to you as of August 31, 1980." (Emphasis added.) The $ 950,000 balance corresponded to the amount reflected as a loan on RFL's books as of September 1, 1980. Accordingly, Racal Vikonics' independent auditors, David Berdon & Co., accounted for the advances as current liabilities on the financial statements it prepared for Racal Vikonics. Each period (i.e., every 4 weeks), RFL accrued and recorded on its books the following interest income on its advances to Racal Vikonics: Date
Amount
May 23, 1980
$   2,558
June 20, 1980
4,250
July 18, 1980
4,881
August 15, 1980
6,550
September 12, 1980
9,179
October 10, 1980
12,548
November 7, 1980
15,508
December 5, 1980
22,694
January 2, 1981
34,832
January 30, 1981
36,071
February 27, 1981
37,561
March 31, 1981
36,901
Total
$ 223,533 On its Federal income tax returns for the relevant periods, Racal Vikonics deducted its accrued interest on the advances from RFL as well as reporting the advances as loans. There was no specific repayment date provided for the advances made *557 by RFL to Racal Vikonics. Rather, RFL expected repayment when Racal Vikonics had sufficient cash flow. Other advances by RFL to REPLC Group companies were repaid. Although RFL had not been repaid by Racal Vikonics, RFL continued to advance funds based upon Racal Vikonics' optimistic projections of future performance. Although Racal Vikonics continued to lose money, in March 1981, Kaufman projected to REPLC that Racal Vikonics would be profitable (prefinance) by P-5 of fiscal year 1982. 4. RHI's Advances to Racal Vikonics
In early 1981, REPLC decided to expand the management and financial functions of its U.S. holding company, RHI. As part of this plan, the REPLC officials resigned from Racal Vikonics' board of directors and were replaced by directors of RHI. Also as part of this strategy, RHI assumed RFL's role as lender of working funds to REPLC's U.S. subsidiaries. In order to facilitate RHI's assumption of its lending role, the following transactions took place. On March 31, 1981, REI borrowed $ 20,375,000 from Barclays Bank International (Barclays), with which it made a $ 20,375,000 loan repayment to Racal-Milgo, Inc. On that same day, Racal-Milgo, Inc., paid a $ 22,500,000 *558 dividend to RHI. RHI, in turn, transferred $ 20,375,000, through Barclays, to several of its United States subsidiaries, including Racal Vikonics. The amount received by Racal Vikonics from RHI was $ 2,962,163, which corresponded exactly with the sum of its advances from RFL ($ 2,738,700) and the accrued interest ($ 223,463). At the same time, Racal Vikonics paid RFL $ 2,962,163 with the funds received from RHI. On March 31, 1981, Max Kaye, REPLC's group controller, sent the following telex to Kaufman: Following transactions have gone through your account with Barclays Bank New York. -- Received from Racal Holdings Inc. U.S. Dollars 2962, 163 Paid to Racal Finance Limited U.S. Dollars 2962, 163 This loan replaces existing borrowing from RFL. Interest payable to RHI from P.1 will be at Continental Illinois prime rate. [Emphasis added.]
RHI recorded its $ 2,962,163 advance to Racal Vikonics as a loan on its books and records. On March 31, 1981, Racal Vikonics had a negative net worth -- its total stockholders' deficit was $ 1,507,241 (including loans payable to affiliate of $ 2,962,163). On August 19, 1982, the Racal Vikonics' board of directors was presented with the following *559 reports for fiscal year 1982: an operations forecast, a balance sheet forecast, a cash flow forecast, and an operating plan. These reports, which were prepared by Kaufman and his staff, projected pre-tax profits in excess of $ 1.2 million for fiscal year 1982. On October 13, 1981, RHI advanced $ 31,000 to Racal Vikonics, which RHI contemporaneously recorded on its books and records as a loan. At Racal Vikonics' January 7, 1982, board of directors meeting, Kaufman and Edwin Hilpert (Hilpert) presented the board with an operating forecast, revised as of January 6, 1982, projecting revenues between $ 4.3 million and $ 4.6 million for fiscal year 1982, an increase over the prior year's revenue of $ 1.9 million. On that same day, RHI advanced Racal Vikonics $ 150,000, which RHI contemporaneously recorded in its books and records as a loan. On January 8, 1982, Kaufman, on behalf of Racal Vikonics, signed a demand note for the $ 150,000 advance, which provided for interest on the unpaid balance at the prime rate plus one percent as set by Continental of Illinois National Bank. Despite Racal Vikonics' projections of profits it continued to generate losses. By February 23, 1982, Racal *560 Vikonics' board of directors had concluded that the financial reports generated by Racal Vikonics' accounting staff "exhibited internal inconsistencies and were unreliable." Despite RHI's $ 150,000 cash advance in January, Racal Vikonics continued to encounter cash flow problems. On March 3, 1982, Kaufman wrote Kaye at REPLC explaining the need for another advance: In January RHI lent RVI 150K which was suggested to solve the previous cash problems. This would have come close to solving the problem if 100% ($ 304K) of all collections were made; the amount actually collected in that period was $ 183,306, and unfortunately that left a 121K short fall * * *. Instead of paying past accounts at present we are paying for currently needed materials, with cash overage going to reducing past balances. As you can see it is a "Catch 22"; as fast as we get money in we are paying for new materials, leaving little to pay old bills. As of this date we are still having cash problems and are getting heavy pressure from vendors. On March 15, 1982, RHI made Racal Vikonics its final advance. This advance of $ 149,348 covered payroll checks which had been issued by Kaufman without sufficient funds *561 in the bank. As a result of his concern over personal liability -- the Racal Vikonics directors were unable to get director's liability insurance -- in addition to his concern over the events surrounding Kaufman's issuance of the payroll checks without sufficient funds, Hilpert resigned as a director of Racal Vikonics. Other directors also resigned at that time. On March 31, 1982, Racal Vikonics still had a negative net worth -- its total stockholders' deficit was $ 2,592,389 (including loans payable to affiliates of $ 3,894,567). During each accounting period from April 1, 1981, through March 4, 1983, RHI calculated and recorded in its books and records the following interest due from Racal Vikonics on the $ 2,962,163 advance: Accounting
Avg. Prime
Period
Interest Rate
Interest Accrued
FY 1982
P-1
17.50%
$ 33,818.03 P-2
18.70%
43,857.83 P-3
20.25%
47,708.58 P-4
20.25%
48,414.46 P-5
20.50%
50,001.17 P-6
20.50%
50,798.41 P-7
19.75%
49,225.74 P-8
18.17%
46,049.45 P-9
16.50%
42,298.35 P-10
15.63%
41,030.97 P-11
15.75%
41,838.23 P-12
16.44%
44,439.48 P-13
16.50%
52,961.27 adjustment
(72.02)
[3] *562 $ 592,297.93 FY 1983
P-1
16.50%
51,404.45 P-2
16.50%
48,637.17 P-3
16.50%
49,261.35 P-4
16.50%
49,623.55 P-5
15.00%
46,264.82 P-6
13.75%
41,939.47 P-7
12.83%
41,430.51 P-8
12.00%
37,959.32 P-9
11.75%
36,821.18 P-10
11.50%
36,639.42 P-11
11.25%
35,586.01 P-12
10.75%
35,425.99 $ 510,993.24 For fiscal year ending March 31, 1982, petitioner reported interest income of $ 592,297.93 on its Federal income tax return and financial statement in connection with RHI's $ 2,962,163 advance to Racal Vikonics, as well as $ 510,993.24 for fiscal year ending March 31, 1983. During each accounting period from October 13, 1981, through March 31, 1982, RHI calculated and recorded on its books and records the following interest due from Racal Vikonics on its $ 31,000 advance: Avg. Prime
Period
Interest Rate
Interest Accrued
P-8
17.75%
$   368.99
P-9
16.25%
395.21
P-10
15.63%
386.24
P-11
15.75%
393.84
P-12
16.44%
417.65
P-13
16.50%
498.55
$ 2,460.48
For fiscal year ending March 31, 1982, petitioner reported interest income of $ 2,460.48 on its Federal income tax return and financial statement in connection with RHI's $ 31,000 advance to Racal Vikonics. During each accounting period for fiscal years ending March 31, 1982 and 1983, RHI calculated and recorded on its books and records the following interest income due from Racal Vikonics on its $ 150,000 loan: Period
Interest Accrued
FY 1982
P-11
$ 1,535.42 P-12
2,065.73 P-13
2,463.97 adjustment
(3.14)
$ 6,061.98 FY 1983
P-1
$  2,275.90 P-2
2,155.15 P-3
2,184.48 P-4
2,202.92 P-5
2,065.58 P-6
1,887.42 P-7
1,868.88 P-8
1,725.92 P-9
1,620.06 P-10
1,673.54 P-11
1,631.71 P-12
1,627.37 $ 22,918.93 For *563 fiscal year ending March 31, 1982, petitioner reported interest income of $ 6,061.98 on its Federal income tax return and financial statement from RHI's $ 150,000 advance to Racal Vikonics, as well as $ 22,918.93 for fiscal year ending March 31, 1983. Similarly, Racal Vikonics treated RHI's advances as loans as its books and records. For example, Racal Vikonics' audited financial statements for fiscal year ending March 31, 1982, reflected the following footnote: TRANSACTIONS WITH AFFILIATE
At March 31, 1981, the Company [Racal Vikonics] had received advances from Racal Holding Co., an affiliated company, totaling $ 2,962,163 (including accrued interest of $ 223,463). Interest on this balance is being charged at the prime rate. Interest on current year advances is being charged at the prime rate plus 1 per cent.
Moreover, on its Federal income tax returns for fiscal years ending August 31, 1980, March 31, 1981, and March 31, 1982, Racal Vikonics deducted accrued interest expense on its various advances from RFL and RHI. 5. Payments by Racal Data Communications on Behalf of Racal Vikonics
For the years at issue, Racal Data Communications, Inc. (RDCI), was a wholly owned subsidiary *564 of petitioner and its Federal income tax returns were consolidated in petitioner's returns. Occasionally, RDCI would pay Racal Vikonics' creditors on behalf of Racal Vikonics. During the years at issue, RDCI made the following payments to Racal Vikonics' creditors on behalf of Racal Vikonics: Vendor
Date
Amount
Rusco Electronic System
05/08/81
$  39,700.00
07/30/81
71,347.45
Hill and Knowlton
12/08/81
44,017.01
Ronald Rappo Trust Acct.
02/09/82
10,000.00
Parker, Auspitz, Neesman,
& Delehanty
08/05/82
505.00
09/29/82
4,522.04
11/09/82
803.98
11/17/82
543.14
CT Corporation System
07/22/82
317.97
SKS Group, LTD.
07/26/82
374.00
Unidentified Charges
92.10
$ 172,222.69
The payments made by RDCI to Rusco Electronic System (Rusco) were for electrical parts and were made pursuant to a Letter of Continuing Guarantee issued by RDCI to Rusco on behalf of Racal Vikonics. RDCI accounted for the above payments in its books and records in part as accounts receivable from Racal Vikonics, and in part as loans receivable from Racal Vikonics. On its Federal income tax return for fiscal year ending March 31, 1983, petitioner claimed $ 172,223 in miscellaneous business deductions for the payments made by RDCI on behalf of Racal Vikonics. *565 Respondent disallowed these deductions because RDCI was not legally liable for its related corporation's expenses and treated the payments as an additional investment in Racal Vikonics. 6. Additional Advances by RFL
After RHI's final advance in March 1982, Racal Vikonics requested additional funds directly from REPLC. In order to sustain Racal Vikonics as a viable asset, REPLC directed RFL to make additional loans to Racal Vikonics. Accordingly, RFL advanced Racal Vikonics the following amounts: [4]
Date
Amount
05/17/82
$ 150,000
06/09/82
150,000
07/02/82
100,000
08/26/82
100,000
$ 500,000 Consistent with its normal policy, RFL calculated and recorded the following interest income each period on its additional advances to Racal Vikonics: Date
Amount
06/25/82
$  4,284
07/23/82
5,038
08/20/82
4,615
09/17/82
5,192
10/15/82
5,048
11/12/82
4,616
12/10/82
4,424
01/07/83
4,424
02/04/83
4,232
$41,873
7. Severance of the REPLC Group's Relationship with Racal Vikonics
After Hilpert and other Racal Vikonics U.S. *566 directors resigned in March 1982, REPLC became increasingly concerned with the financial projections and information it was receiving from Kaufman and Racal Vikonics. In a letter to Lomer dated July 28, 1982, Hilpert discussed Racal Vikonics' business potential as well as its management and financial problems. In September 1982, Lomer and John Stradling (Stradling), chairman of Racal Security Ltd., a REPLC subsidiary, assumed positions on Racal Vikonics' board of directors. Stradling visited Racal Vikonics several times in order to examine the day-to-day operations of the company. The deterioration of REPLC's relationship with Racal Vikonics continued. The agenda for the September 24, 1982, Racal Vikonics board of directors meeting, which was prepared by Kaufman, listed "Restructure of Debt" as one of the topics for discussion. This agenda reflected Kaufman's desire to find some way of minimizing the interest charges on the RHI debt. No action was taken on restructuring the debt. After the September 24, 1982, Racal Vikonics board of directors meeting, Stradling again visited Racal Vikonics. Stradling's visit resulted from REPLC's concern that Racal Vikonics' rate of shipments, *567 and accordingly its profitability, was not meeting its projections. Stradling was not well received by the staff of Racal Vikonics on this visit. Indeed, at one point Stradling was locked out of the Racal Vikonics offices. Upon Stradling's return to England, REPLC's board of directors determined that they would have to either terminate their relationship with Racal Vikonics or devote a great deal more of REPLC's management resources to Racal Vikonics and keep it under control. In either November or December 1982, REPLC decided to terminate petitioner's relationship with Racal Vikonics. Thereafter, REPLC's representatives engaged in negotiations with Kaufman for the return of Racal Vikonics to him. As part of the final negotiations, Kaufman asked that Racal Vikonics' debt to the REPLC companies, including petitioner, be forgiven. The REPLC representatives did not wish to lose their credibility in their world markets because of Racal Vikonics' failure to complete its contracts. On February 3, 1983, petitioner's representatives, Kaufman, and Kaufman's attorney reached a series of agreements severing Kaufman's and Racal Vikonics' relationship with petitioner and the REPLC Group. *568 In accordance with their agreement the parties executed the documents listed below in the following order: 1. Stock Agreement in which petitioner agreed to contribute all of its Racal Vikonics stock back to the capital of the company thereby returning sole ownership to Kaufman. 2. Cancellation of Indebtedness in which petitioner agreed to cancel $ 4,770,433 in outstanding debts due from Racal Vikonics, including the $ 4,391,191 lent by RHI to Racal Vikonics and the $ 172,223 advanced by RDCI to Racal Vikonics. 3. Loan Agreement in which petitioner agreed to lend Racal Vikonics an additional $ 150,000 (interest free) which was to be paid directly to Racal Vikonics' creditors and which Racal Vikonics was to repay to petitioner over the next 4 years. 4. Debt Compromise Agreement in which RFL agreed to cancel the $ 500,000 in new loans plus interest, totaling $ 541,873 owed to it by Racal Vikonics in exchange for Racal Vikonics' promise to pay RFL a percentage of future net, pre-tax earnings in an amount not exceeding $ 500,000 in the aggregate.
The Stock Agreement provided that in return for RHI's promise to return its shares of stock to Racal Vikonics, Racal Vikonics and Kaufman agreed *569 to change the company's name back to Vikonics (all references hereinafter shall be to Vikonics), notify all of its creditors, debtors, and customers of the name change and RHI's disassociation, and discontinue using any stationery containing the Racal Vikonics name. The parties also mutually agreed to release each other from any matter outside the agreements of February 3, 1983. In addition, Vikonics and Kaufman agreed to use their best efforts to avoid involving the REI Group or any of its directors or employees in litigation relating to Vikonics. In the event of unavoidable litigation, Vikonics agreed to indemnify anyone from the REI named as defendant. Vikonics and Kaufman also agreed to use their best efforts to complete as soon as possible all outstanding contracts between Vikonics and its customers and promptly settle any existing disputes. Finally, the Stock Agreement terminated the Stock Purchase Agreement, and the Escrow and Stockholder Agreement dated November 9, 1979. The Cancellation of Indebtedness, in relevant part, recited the following clauses: WHEREAS, from time to time, rather than having Vikonics borrow from a bank, RHI loaned money to Vikonics pursuant to the *570 Stockholder Agreement to be used by Vikonics for current operating expenses; and WHEREAS, RHI loaned these amounts to Vikonics at an average annual interest rate of 15%, which interest was accrued regularly and appropriately on the books of both RHI and Vikonics; and * * * WHEREAS, RHI and the Racal Subsidiaries have now demanded repayment in full in the total amount of $ 4,770,433, representing principal and interest outstanding to date of the loans from RHI and the intercompany accounts * * *; and WHEREAS, Vikonics is unable to repay this debt; and WHEREAS, [REPLC], the Racal Subsidiaries, and RHI [the "Racal Group"] no longer wish to attempt to collect the amounts owed to them by Vikonics; and WHEREAS, Vikonics has outstanding certain contracts and debts that the Racal Group desires to have completed and paid, respectively, as soon as possible after the date hereof.
The Cancellation of Indebtedness Agreement further provided that in exchange for the Racal Group's promise to formally cancel Vikonics' debt, Vikonics again agreed to the following conditions that it had already agreed to in the Stock Agreement: to release the Racal Group from any matter outside the agreements of February *571 3, 1983; to use its best efforts to avoid litigation and in the event of unavoidable litigation, to indemnify the Racal Group; and to use its best efforts to complete all existing contracts as soon as possible. With or without this document, Vikonics had an existing obligation to complete its outstanding contracts. Also on February 3, 1983, the Vikonics' board of directors entered into a resolution changing the company's name back to Vikonics, Inc. 8. Subsequent Events -- Vikonics
As of July 13, 1983, Vikonics' ledgers still carried the advances from RHI as notes payable. Thereafter, Vikonics and Kaufman consulted with their attorney and accountants regarding the consequences of the February 3, 1983, agreements. On September 13, 1983, Kaufman met with Vikonics' attorney, Howard Breslow, and its accountants, Jay Ofsink and Howard Misthal of David Berdon & Co., to discuss the treatment of the REPLC Group advances and subsequent cancellation, as well as the Debt Compromise Agreement of February 3, 1983, for tax and accounting purposes. The parties discussed the following general alternative treatments: (1) that the entire cancellation be treated as forgiveness of indebtedness; (2) *572 that the $ 500,000 contingent obligation be treated as an equity interest exchanged for the entire indebtedness; (3) that the advances by the REPLC Group be treated from their inception as capital contributions; and (4) that the advances be treated as capital contributions as of the date of the agreement, February 3, 1983. The parties discussed that the first alternative -- forgiveness of debt -- would result in taxable income to Vikonics. The parties assumed that the income would be limited by the amount of Vikonic's solvency after the forgiveness, roughly $ 1 million, which would be "absorbed by current and prior losses, an elimination of all net operating loss carryforwards to future years and a reduction in the tax basis of assets of $ 1 million * * * [and] result in a loss of tax deductions over some future period of $ 1 million and an increase in tax of approximately $ 500,000." After considering the tax ramifications of the alternatives, the parties decided to treat the cancellation of indebtedness as a contribution of capital from the point of RHI's initial advance. Accordingly, it was also decided to "reverse" the interest expense on the advances into income. The parties *573 further recognized that for accounting purposes footnote disclosure would be required as to the "tax contingencies" of the chosen treatment and that a provision would have to be made for the potential loss of tax deductions. As of October 10, 1983, Vikonics' ledger reflected $ 4,338,739 written off as a contribution to capital. Kaufman's advisers told him that there was a possibility that Vikonics' treatment of the cancelled advances as capital contributions might not withstand IRS scrutiny in the event of an audit. This uncertainty was noted in Vikonics' subsequent financial statements which it filed in a registration with the Securities and Exchange Commission. 9. Subsequent Events -- REI Group
RHI's final ledger for its fiscal year ending March 31, 1983, reflects a "bad debt write off" of $ 4,391,191 on March 28, 1983, which amount consisted of $ 3,292,511 in principal and $ 1,098,680 in accrued interest income. On petitioner's consolidated Federal income tax return for taxable year ended March 31, 1983, RHI claimed a bad debt deduction in the amount of $ 4,391,191. Respondent determined that the forgiveness of debt of the principal and accrued interest was a contribution of *574 capital and disallowed the claimed deduction in its entirety. OPINION A. Bad Debt Issue -- RHI's Advances to Vikonics
Section 166(a)(1) generally allows a deduction for any debt which becomes worthless within the taxable year. Section 1.166-1(c), Income Tax Regs., requires that the subject debt be "bona fide debt," which is defined as a debt that "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." A contribution to capital is not a bona fide debt. Sec. 1.166-1(c), Income Tax Regs.
Petitioner argues that the advances made to Vikonics by RHI, which replaced the initial advances made by RFL, were bona fide debt. This debt, argues petitioner, became worthless when RHI cancelled the debt on February 3, 1983. Respondent, on the other hand, advances a series of alternative arguments as to why petitioner is not entitled to a bad debt deduction pursuant to section 166(a)(1). Respondent's primary argument, as raised in his first amended answer, is that the funds advanced by RHI to Vikonics were initially capital contributions rather than debt, and therefore section 166(a)(1) is not applicable. In the alternative, *575 respondent asserts his notice of deficiency position -- that RHI converted the putative debt into a capital contribution when it forgave Vikonics' indebtedness on February 3, 1983. In his second amended answer, respondent raises a further alternative argument: even if RHI's advances were debt, they were not worthless because it received something of value in exchange for its cancellation of the indebtedness. 1. Debt Versus Equity Issue
As a threshold issue we must decide whether RHI's [5] *576 advances to Vikonics were initially debt (loans), as petitioner argues, or equity (contributions of capital), as respondent contends. Despite consideration by the Secretary since 1969 [6] and by the courts for decades, there are no uniform standards for resolving the debt versus equity issue and each case must depend on its own facts. John Kelley Co. v. Commissioner, 326 U. S. 521 (1946).The fundamental inquiry is whether the parties had a genuine intention to create a debt, with a reasonable expectation of repayment, and whether that intention was reflected in the economic reality surrounding the transaction. Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973). The Court of Appeals for the Eleventh Circuit, to which appeal in this case lies, has set forth the following 13 factors which merit consideration in deciding whether the advances at issue constitute debt or equity: 1. The names given to the certificates evidencing the indebtedness; 2. The presence or absence of a fixed maturity date; 3. The source of payments; 4. The right to enforce payment of principal or interest; 5. Participation in management flowing as a result; 6. The status of the *577 contribution in relation to regular corporate creditors; 7. The intent of the parties; 8. "Thin" or adequate capitalization; 9. The identity of interest between creditor and stockholder; 10. Source of interest payments; 11. The ability of the corporation to obtain loans from outside lending institutions; 12. The extent to which the advance was used to acquire capital assets; 13. The failure of the debtor to repay on the due date or to seek a postponement. [Stinnett's Pontiac Service, Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir. 1984), affg. a Memorandum Opinion of this Court.] The Eleventh Circuit's approach is to consider all the factors while realizing that no one factor is controlling and the factors are not of equal significance. Stinnett's Pontiac Service, Inc. v. Commissioner, supra; Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972). Although this issue was raised by respondent in his amended answer, the burden of proof remains with petitioner. See Order and Memorandum Sur Order dated August 2, 1988 (holding, inter alia, that respondent's theory merely clarified his original determination without being inconsistent or increasing the amount of *578 the deficiency and therefore was not a new matter requiring the placing of the burden of proof on respondent). At the outset we note that courts have traditionally examined advances between a parent corporation and a subsidiary with close scrutiny because the former's control over the latter creates an opportunity to create fictional debt. In re Unieco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976).We also point out, however, that "a transaction must not be disregarded simply because it was not at arm's length." Sun Properties v. United States, 220 F.2d 171, 174 (5th Cir. 1955) (citation omitted; emphasis in original). As a final prefatory matter, we note that respondent refers throughout his brief to the control exerted over Vikonics by RHI by virtue of its 65-percent ownership of Vikonics' stock and its control of Vikonics' board of directors. Respondent contends that because of this control, Vikonics was economically captive to RHI, and therefore, we should accord little weight to Vikonics' characterization in its books and records of the advances as loans. We disagree. Although RHI owned 65 percent of the Vikonics stock, Kaufman, who owned the remaining 35 percent of the stock, *579 remained in charge of the day-to-day operations. Indeed, the record reflects that despite the presence of RHI directors on Vikonics' boards, Kaufman operated the company his own way. Respondent also places great significance on the Purchase Agreement provision that required RHI to purchase Kaufman's remaining 35 percent interest over a period of time from 1984 to 1987 at a price based on Vikonics future profitability. Respondent argues that RHI, by virtue of its control over Vikonics, classified the advances as debt in order to reduce the price it would eventually have to pay for the remaining Vikonics stock. Rather than supporting respondent's position, however, this buy-out provision can also be viewed as giving Kaufman even more of an incentive to object to Vikonics' acceptance of the advances as debt, yet he did not object. Although Kaufman did voice concern over the amount of the interest charges, we are mindful that the first mention that the advances were capital contributions rather than debt occurred after Kaufman's tax advisers informed him of the adverse tax effects concomitant with the advances being classified as debt. With these parameters in mind, we proceed with *580 our consideration of the 13 factors used by the Court of Appeals for the Eleventh Circuit in Stinnett's Pontiac Service, Inc. v. Commissioner, supra.
a. Name Given to the Certificate
The advances at issue (with the exception of the $ 150,000 advance of January 7, 1982, for which Kaufman signed a demand note) were not manifested by any formal certificate bearing any fixed maturity date; nevertheless, this lack of formality is not fatal: Although the complete absence of any specific evidence of indebtedness might on first blush appear to reveal little about the quality of the transaction, the real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice. * * * We do not, however, find the lack of such formal evidence dispositive where as here there is other ample evidence that arm's length and normal business standards were applied to the transaction in question. * * * [Estate of Mixon v. United States, 464 F.2d at 403.]
In the instant case, both RHI and Vikonics treated the advances as loans on their respective tax returns and financial statements. The advances were made pursuant to a written *581 lending letter. Furthermore, RHI charged market rate interest on the advances. RHI reported this interest income on its Federal income tax returns, and Vikonics claimed interest expense deductions. Although there was no fixed maturity date, repayment was to be when Vikonics had sufficient cash flow. These features more closely resemble arm's length and normal business practice for the issuance of debt rather than equity. Respondent cites Alterman Foods, Inc. v. United States, 505 F.2d 873, 879 (5th Cir. 1974), in support of his argument that we should accord little weight to the consistent bookkeeping and financial reporting by RHI and Vikonics because of the control exerted by the former over the latter. Alterman Foods is distinguishable from the instant case. Although the books of the parent and subsidiary reflected the advances as debt, there were no interest charges, no set maturity date, no notes of indebtedness, and no legal compulsion to repay the outstanding amounts. Accordingly, the Court of Appeals for the Fifth Circuit affirmed the trial court's finding that the advances were disguised dividends rather than genuine debt. In the instant case, market interest rate was *582 charged and repayment was to be made when Vikonics had sufficient cash flow. Moreover, RHI's advances were not a disguised dividend scheme. b. The Presence or Absence of a Fixed Maturity Date
" The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of the same on the other hand would indicate that repayment was in some way tied to the fortunes of the business, indicative of an equity advance." Estate of Mixon v. United States, supra at 404 (citation omitted). Although no fixed repayment date existed for Vikonics' repayment of the advances, the understanding between the parties was that Vikonics would repay the advances when it had sufficient cash flow. Based upon Kaufman's optimistic profit projections, RHI was justified in expecting that Vikonics would be profitable and repaying the advances within one or two years, although this did not occur. See American Processing and Sales Co. v. United States, 371 F.2d 842, 856-857 (Ct. Cl. 1967) (holding that open accounts held by shareholder were debt where sales reports justified shareholder's confidence in sister corporation's future ability to repay). Accordingly *583 , although the absence of a fixed repayment date would normally be a characteristic of equity, it is not in the instant case. c. The Source of Payments
Generally, an advance has the appearance of equity where repayment is possible only from corporate earnings. To the contrary, if repayment is not dependent upon earnings, debt is indicated. Estate of Mixon v. United States, supra at 405. RHI's advances were not repaid. We must therefore conclude that any repayments would have had to be from corporate earnings. Although this is an indicia of equity, we do not accord it great weight. Estate of Mixon v. United States, supra at 405 n. 15 ("This factor is somewhat anomalous in view of the fact that the majority of bona fide loans are likewise repaid out of earnings."); American Processing and Sales Co. v. United States, supra at 856 ("In the final analysis all loans to a company depend for their repayment on the success of the borrower, and this is, of course, equally true of salvaging equity investments."). d. The Right to Enforce Payment of Principal or Interest
"If there is a definite obligation to repay the advance, the transaction would take on some indicia of a loan." Estate of Mixon v. United States, supra at 405 *584 (citation omitted). The record reflects an obligation by Vikonics to repay the advance. RHI and Vikonics recorded the advances as loans on their respective books and records. The advances were made pursuant to the original lending letter providing for terms of interest and repayment. RHI reported on its Federal tax returns accrued interest income from the advances while Vikonics claimed deductions for accrued interest expense. Indeed, Vikonics' request that RHI formally forgive the debt indicates that Vikonics considered itself under an obligation to repay the advances. e. Participation in Management Flowing as a Result
If RHI's participation in Vikonics' management increased as a result of the advances, a capital contribution would be indicated. Stinnett's Pontiac Service, Inc v. Commissioner, 730 F.2d at 639.RHI did not, however, increase its participation in the management of Vikonics as a result of the advances. Under the Escrow and Shareholder Agreement dated November 9, 1979, Kaufman was entitled to nominate one director to the Vikonics board and RHI was entitled to nominate the remaining directors. This arrangement remained the same after RHI made the advances. In *585 addition, Kaufman continued to oversee Vikonics' day-to-day operations. f. The Status of the Contribution in Relation to Regular Corporate Creditors
"Whether the advance has a status equal to or inferior to that of regular corporate creditors is, of course, of some import in any determination of whether taxpayer here was dealing as a shareholder or a creditor." Estate of Mixon v. United States, supra at 406 (citations omitted). Although RHI's advances to Vikonics were not expressly subordinated to any other corporate debt, Vikonics did pay other creditors while it failed to pay RHI. This arrangement was, in effect, a subordination of RHI's advances. While this subordination is an indicia of equity, we note that Vikonics' payments to its other creditors ahead of RHI were consistent with the purpose of the advances -- to provide short-term financing to enable Vikonics to meet its obligations. g. The Intent of the Parties
"The intent of the parties is to be considered in determining the debt versus equity question, but '[the] subjective intent on the part of an actor will not alter the relationship or duties created by an otherwise objectively indicated intent.'" Stinnett's Pontiac Service, Inc. v. Commissioner, supra at 639, *586 quoting Estate of Mixon v. United States, supra at 407; see also Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367 (1973). In the instant case, the objective factors weigh more heavily toward debt than equity. The parties accounted for the advances as loans, interest was accrued on the outstanding amounts, the parties referred to the advances as loans in various correspondence, and repayment was intended. Moreover, the evidence indicates that the parties subjectively intended RHI's advances to be loans which were to be repaid. h. "Thin" or Adequate Capitalization
thin capitalization is very strong evidence of a capital contribution where (1) the debt to equity ratio was initially high, (2) the parties realized the likelihood that it would go higher, and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations. [Estate of Mixon v. United States, 464 F.2d at 408 (citations omitted).]
When RHI acquired its interest in Vikonics on November 9, 1979, it made a capital contribution of $ 800,000, which increased Vikonics' capital account to a total of $ 1,120,013. Prior to RFL's advances, Vikonics *587 had no short-term debt, other than trade accounts payable and accrued liabilities, and long-term debt of $ 9,030. Accordingly, Vikonics was not insufficiently, or "thinly," capitalized when RFL initially advanced funds to it. On August 31, 1980, and thereafter, Vikonics' total stockholders' equity was a deficit. Therefore, calculating a debt/equity ratio is impossible. Although this might be an indicia of equity, two mitigating factors negate this effect. First, Vikonics was sufficiently capitalized when RFL began making the advances. We reject respondent's argument that we again examine Vikonics' capitalization on March 31, 1981, when RHI took over RFL's financing responsibility. Rather than injecting new funds into Vikonics, there was simply an intercorporate change of financing companies for business purposes. Second, RFL's advances, and later RHI's, were based upon the optimistic profit projections submitted by Kaufman for Vikonics. These projections gave RHI reasonable justification for advancing funds to Vikonics since under the projections, Vikonics would soon return to profitability and erase the deficit in total stockholders' equity. i. The Identity of Interest between *588 Creditor and Stockholder
"If advances are made by shareholders in proportion to their respective stock ownership, an equity capital contribution is indicated." Estate of Mixon v. United States, supra at 409 (citations omitted). RHI's advances were disproportionate. RHI owned 65 percent of the Vikonics common stock, yet made 100 percent of the advances. Respondent argues that RHI's control over Vikonics and its right to buy the remaining 35 percent negate any indicia of debt drawn from the disproportionate advances. We disagree. First, RHI did not, as respondent argues, have an option to buy the remaining shares at any time. Rather, it was required to do so over a period from 1984 to 1987, an event which never transpired. At the time RHI advanced the funds, it only held 65 percent of the Vikonics common stock. Furthermore, RHI did not possess nor did it ever attempt to exercise the amount of control asserted by respondent. j. Source of Interest Payments
"A true lender is concerned with interest." Curry v. United States, 396 F.2d 630, 634 (5th Cir. 1968).In the instant case, the terms under which RHI advanced funds to Vikonics required interest on the advances. Indeed, RHI calculated *589 interest every 4 weeks, and RHI and Vikonics recorded accrued interest income and expense, respectively, on their books and records. Furthermore, RHI and Vikonics consistently reported accrued interest income and expense, respectively, on their financial statements and Federal income tax returns for taxable years ending March 31, 1982 and 1983. Vikonics' failure to pay the accrued interest weakens this indicia of debt. As we have previously discussed, however, RHI was reasonably justified, based upon Vikonics' financial projections made periodically by Kaufman, in expecting eventual repayment of both accrued interest and the principal amount of the advances. Indeed, when RHI determined that Vikonics' projections were no longer reliable, it made only one more advance -- to cover the payroll checks issued without sufficient funds by Vikonics. k. The Ability of the Corporation to Obtain Loans from Outside Lending Institutions
If a corporation is able to borrow funds from outside sources at the time an advance is made, the transaction has the appearance of a bona fide indebtedness. The purpose of this inquiry is obviously to test whether the shareholder contributors acted in the same *590 manner toward their corporation as ordinary reasonable creditors would have acted. If no reasonable creditor would have loaned funds to the corporation at the time of the advance, an inference arises that a reasonable shareholder would likewise not so act. * * * [Estate of Mixon v. United States, 464 F.2d at 410 (citations omitted).]
In April 1980, before RFL made its initial advance to Vikonics, Vikonics negotiated a $ 500,000 loan from Manufacturers Hanover. Manufacturers Hanover requested that REPLC guarantee the loan. Respondent argues that Vikonics could not have secured credit without REPLC's guarantee. Petitioner contends that Manufacturers Hanover's request that REPLC guarantee the loan was merely pro forma, rather than reflective of any doubt in Vikonics' ability to repay the loan. Because of the REPLC Group's policy that financing be done within the corporate group, Vikonics made no other attempts to obtain outside financing. Based on the above, we draw no inference in favor of either debt or equity. Although it appears that Vikonics was initially capable of obtaining loans from outstanding lending institutions, it seems equally clear that as its losses continued to *591 mount it would be less likely, if not impossible, to do so. l. The Extent to Which the Advance Was Used to Acquire Capital Assets
The use of advances to provide working capital for day-to-day operations is an indicia of debt. See Estate of Mixon v. United States, 464 F.2d at 410.The record reflects that the advances were used to fund the day-to-day working capital needs of Vikonics, rather than acquiring capital assets. For example, we note that the advances made in the 10-month period from May 30, 1980, through March 17, 1981, were made more or less periodically and ranged from $ 50,000 to $ 275,000 with an approximate mean of $ 134,000. This pattern also suggests that the funds were used for day-to-day operations rather than the acquisition of capital assets. m. The Failure of the Debtor to Repay on the Due Date or to Seek a Postponement
There was no due date provided for repayment of the indebtedness. Rather, the terms under which the advances were made were that Vikonics would repay the advances when they had sufficient cash flow. Vikonics never did. On or before February 3, 1983, RHI made formal demand according to documents executed on that day. The parties agreed Vikonics *592 was unable to pay. Although the absence of repayment indicates equity, we do not accord it much weight because the result was consistent with the conditions of the advances, i.e., that repayment would occur when Vikonics had sufficient cash flow. After reviewing the above 13 factors, and paying particular attention to the contemporaneous intent of the parties and the economic realities surrounding the transactions, we conclude that the advances made by RHI constituted bona fide debt rather than equity. In retrospect, we now know that Vikonics was never able to repay the advances, and the profit projections, upon which RHI relied, were overly optimistic. As is often said, however, "hindsight is 20-20." Thus, we look to the parties' intent and the economic realities at the time of the advances. In evaluating Vikonics' intent, we take note of the September 13, 1983, meeting, involving Kaufman and Vikonics' attorney and accountants, at which it was decided to treat RHI's advances as capital contributions from inception. This decision was made to allow Vikonics, and Kaufman indirectly, to escape otherwise adverse Federal income tax consequences. Respondent places great reliance on *593 Kaufman's testimony regarding his and Vikonics' intent that Vikonics never intended to repay the advances at issue. In light of Kaufman's adverse economic interest, as reflected by the September 13, 1983, meeting, we find his testimony regarding Vikonics' never intending to repay the advances self-serving in light of the other cumulative evidence manifesting the parties' original and continuing intent that the advances were loans. With regard to the economic realities surrounding the advances, we accord great significance to both parties' consistent treatment of the interest on the advances. Moreover, Vikonics' profit projections repeatedly forecasted by Kaufman gave RHI reasonable justification to expect repayment of the advances within a reasonably short period of time. 2. Whether RHI Converted the Debt into a Capital Contribution When it Was Cancelled
We next turn to respondent's first alternative theory, which was his notice of deficiency position that RHI converted the debt into a capital contribution when it forgave the debt. In support thereof, respondent argues that even if RHI's advances to Vikonics were debt, the debt was extinguished on February 3, 1983, and thus was *594 not in existence on March 31, 1983, and deductible as a bad debt: To be entitled to a bad debt deduction, a taxpayer must show that a debtor-creditor cause of action exists at the end of the taxable year, albeit [sic] said debt is worthless. Cf. Schneider v. Commissioner, T.C.M. 1981-603; Henry v. Commissioner, 8 B.T.A. 1089 (1927), aff'd, 48 F.2d 459 (C.A.D.C. 1931).* * * * * * In short, there was no worthless debt on March 31, 1983, because it was previously revoked ab initio much like a decedent's prior will and testament is revoked. [Emphasis added.]
Respondent's proposition is contrary to the express language of section 166(a)(1), which generally allows a deduction for "any debt which becomes worthless within the taxable year." (Emphasis supplied.) The argument that the debt was extinguished ab initio because it was cancelled before the end of the tax year has no basis in law or reason. For the above reasons we dismiss respondent's argument on this issue. 3. Whether Vikonics' Debt Was Worthless
We now address respondent's second alternative argument -- that petitioner is precluded from claiming a bad debt deduction for RHI's advances to Vikonics because RHI released the debts *595 for satisfactory consideration in the Cancellation of Indebtedness dated February 3, 1983, and therefore the debts were not worthless, as required by section 166(a)(1). Where there is a mutual agreement of settlement and the agreement provides for the release of a debt for satisfactory consideration, a bad debt deduction is not allowed. See Harrison v. Commissioner, 59 T.C. 578, 592 (1973); see also First National Bank & Trust Co. v. United States, 115 F.2d 194 (5th Cir. 1940); Davies v. Commissioner, 54 T.C. 170 (1970); Northwest Equipment Co v. Commissioner., 34 B.T.A. 371 (1936). Respondent maintains that in releasing Vikonics from its debt, petitioner bargained to release the debts for satisfactory consideration which had intrinsic economic value to petitioner. Petitioner, on the other hand, contends that any consideration received by RHI was illusory at best because Vikonics merely agreed to do things which it would have done in any event or things which it was otherwise required to do. Petitioner further argues that even if the cancellation had some value to Vikonics, the debt was still worthless to petitioner because Vikonics was unable to pay. Respondent raised this issue *596 in his second amended answer. The parties have stipulated that respondent bears the burden of proof on this issue. See Order dated March 8, 1989. For the reasons set forth below we hold that respondent has failed to prove that petitioner received adequate consideration in return for its cancellation of Vikonics' debt and that the debt was not worthless. Although Vikonics agreed in the February 3, 1983, Cancellation of Indebtedness to use its best efforts to avoid litigation involving the Racal Group and to indemnify it if there was unavoidable litigation, Vikonics had already agreed to do so in the Stock Agreement executed that day by which RHI contributed all of its Vikonics stock back to Vikonics. Vikonics also agreed to use its best efforts to complete all existing contracts as soon as possible. However, Vikonics had already agreed to do so in the Stock Agreement. Moreover, with or without this provision, Vikonics had an existing obligation to complete its outstanding contracts. As respondent argues, and petitioner admits, the Racal Group was interested in protecting its reputation after severing its relationship with Vikonics. Nevertheless, the promises made by Vikonics *597 in the Cancellation of Indebtedness were nothing more than reassurances regarding promises Vikonics was already obligated to keep. Indeed, respondent advances no proof of value for the consideration received by petitioner, other than to argue that the face amount of the outstanding debt -- $ 4,770,433 -- was the consideration. We further note that the Cancellation of Indebtedness itself establishes the worthlessness of the debt. RHI demanded payment of the debt and Vikonics was unable to pay. Nor does it appear that Vikonics would have ever been able to pay the debt. Presumably Vikonics wanted the debt canceled so it would be able to get additional outside financing. In addition to canceling the outstanding indebtedness, the REPLC Group loaned Vikonics an additional $ 150,000 (interest free) to be repaid over four years. That loan was used by Vikonics to pay its creditors. Accordingly, we hold that petitioner is entitled to a bad debt deduction for taxable year ended March 31, 1983, in the amount of $ 4,391,191 for loans made by RHI to Vikonics which became worthless in that taxable year. B. RDCI's Payments on Behalf of Vikonics
Finally we turn to the treatment of the $ 172,222.69 *598 in payments made by RDCI to Vikonics' creditors on behalf of its then sister corporation, Vikonics. Petitioner claimed a miscellaneous business deduction on its Federal income tax return for the taxable year ending March 31, 1983. In his notice of deficiency, respondent disallowed petitioner's claimed expenses because RDCI was not legally liable for the expenses of its related corporation, Vikonics, and further determined that the payments were a capital contribution. In its amended petition, petitioner changes its position and contends that RDC's $ 172,222.69 payments on behalf of Vikonics were loans and properly deductible as a bad debt for petitioner's taxable year ending March 31, 1983. Respondent's determinations are presumed correct. Accordingly, petitioner bears the burden of proof. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). 1. Whether RDC's Payments Were Loans
In determining whether RDC's payments were loans we apply the same analysis as we did, supra, in determining whether RHI's advances were debt or equity. Accordingly, we look to whether the parties had a genuine intention to create a debt, with a reasonable expectation of repayment, and whether that intention *599 was reflected in the economic reality surrounding the transaction. Litton Business Systems, Inc. v. Commissioner, 61 T.C. 367, 377 (1973).In so doing we shall examine the payments in light of the 13 factors enunciated by the Court of Appeals for the Eleventh Circuit. Stinnett's Pontiac Service, Inc. v. Commissioner, 730 F.2d 634, 638 (11th Cir. 1984), affg. a Memorandum Opinion of this Court. Petitioner argues that the parties intended the payments by RDCI to be loans. Petitioner further contends that this debt became worthless when RDCI wrote it off on its books and records pursuant to the February 3, 1983, Cancellation of Indebtedness. Respondent, on the other hand, argues that the parties did not intend the payments to be loans. Rather, respondent contends that petitioner "lumped" the $ 172,222.69 into the Cancellation of Indebtedness agreement to preclude any question of whether a debt existed with respect to the advances. Furthermore, respondent maintains that because RDCI's payments did not exhibit any other indicia of debt, the Cancellation of Indebtedness is insuffcient by itself to establish that the payments were debt rather than a capital contribution. For the following *600 reasons we agree with respondent that RDCI's payments did not create a bona fide debt for purposes of the section 166(a)(1) bad debt deduction. We first note that petitioner's deduction of the payments as miscellaneous business expenses for taxable year ending March 31, 1983, is wholly inconsistent with its contention that the payments were intended as loans. Moreover, petitioner offers no explanation for this inconsistency. Rather, petitioner argues as an alternative theory that the payments are also deductible as a miscellaneous business expense because RDCI guaranteed certain debts of Vikonics. Although petitioner is entitled to advance alternative theories, its deduction of the payments as miscellaneous business expenses, without further explanation, is an indication that it did not intend for the payments to be debt. In addition, unlike RHI's advances to Vikonics, there was no provision for interest on the payments advanced by RDCI. Nor were the payments made pursuant to any formal agreement setting forth the loan agreement, such as the lending letter issued by RFL to Vikonics. Furthermore, no provision for repayment was made. The one indicia of debt is that RDCI recorded *601 the payments on its books and records in part as accounts receivable and in part as loans receivable. Vikonics' financial statements reflected an amount due to Racal-Milgo (as RDCI was then known) as of March 31, 1982. These accounting entries and statements, with no further indicia of debt, are insufficient to prove debt. See Alterman Foods, Inc. v. United States, 505 F.2d 873, 879 (5th Cir. 1974) ("Such allegedly objective economic indicia of debt such as consistent bookkeeping and consistent financial reporting on balance sheets are * * * little more than additional declarations of intent, without any accompanying objective economic indicia of debt."). Nor are we persuaded that the payments by RDCI are debt simply by their inclusion in the Cancellation of Indebtedness. We agree with respondent that the Cancellation of indebtedness, by itself, merely settled the existing obligations between Vikonics and RDCI, rather than being determinative for Federal tax purposes. 2. Whether Petitioner Is Entitled to Deduct RDCI's Payments under Sec. 162
Section 162(a) generally allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying *602 on any trade or business. These expenses must be "directly connected with or pertaining to the taxpayer's trade or business." Sec. 1.162-1(a), Income Tax Regs.
As a general rule payment by one taxpayer of the obligation of another taxpayer is not ordinary and necessary. Deputy v. du Pont, 308 U.S. 488 (1940); Welch v. Helvering, 290 U.S. 111, 114 (1933); Lohrke v. Commissioner, 48 T.C. 679, 684 (1967).An exception exists to this rule under which deduction is allowed "when the expenditures were made by a taxpayer to protect or promote his own business, even though the transaction giving rise to the expenditures originated with another person and would have been deductible by that person if payment had been made by him." Lohrke v. Commissioner, supra at 684-685; see also Pepper v. Commissioner, 36 T.C. 886 (1961); Snow v. Commissioner, 31 T.C. 585 (1958). Petitioner argues that RDCI's payments to Vikonics' creditors are deductible as a miscellaneous business expense because the payments were made pursuant to RDCI's guarantee. Respondent counters that the expenses are not deductible because they were not ordinary and necessary, nor was RDCI legally liable for payment. Respondent *603 also argues that $ 165,064.46 of the claimed expenses were incurred in taxable years ending March 31, 1981 and 1982, and thus are not deductible for taxable year ending March 31, 1983, as claimed by petitioner. For the reasons set forth below, we hold that petitioner has failed to prove that RDCI's payments to Vikonics' creditors were ordinary and necessary business expenses of RDCI. [7]
Petitioner argues that RDCI's payments were ordinary and necessary because they were made pursuant to RDCI's guarantee. We first note that the record shows that only the payments to Rusco Electronic System (Rusco) were pursuant to a guarantee. These payments totalled $ 111,047.45. With respect to the remaining $ 61,175.24 in payments, petitioner has failed to even offer an argument as to why they were ordinary and necessary business expenses of RDCI and we shall not consider those payments further. As to the payments from RDCI to Rusco, although the payments were made pursuant to RDCI's *604 guarantee, that by itself is not sufficient for them to be considered ordinary and necessary under section 162(a). Petitioner has not offered any evidence as to why RDCI's guarantee of Vikonics' debts was proximately related to its own business. Indeed, petitioner has not introduced evidence as to what RDCI's trade or business is. Accordingly, we hold for respondent on this issue. In light of the foregoing, Decision will be entered under Rule 155.
Footnotes
1. We previously severed from this case the Group Service Levy issue, which is currently under consideration by the Competent Authorities of the United States and United Kingdom. The parties have settled all other issues except those before the Court. 2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. This table, which was not properly computed, was taken from the Stipulation of Facts.
4. RFL was not part of the REI Group and did not file a Federal income tax return with petitioner. Accordingly these advances are not included in petitioner's claimed bad debt deduction which respondent disallowed.↩
5. Our discussion of RHI's advances necessarily encompasses RFL's initial advances. We view the transactions of March 31, 1981, as merely a substitution of the entity making the advances for business purposes and nothing more. Therefore, unless otherwise indicated, any reference to the advances made by RHI shall include the advances made by RFL. 6. Section 385 was added by the Tax Reform Act of 1969, Pub. L. 91-171, 83 Stat. 487, and empowers the Secretary of the Treasury to promulgate regulatory guidelines on the debt-equity issue. Regulations were proposed in 1980 and withdrawn. Regulations were again proposed in 1982 and subsequently withdrawn in 1983. Since then no new regulations have been proposed.↩
7. For purposes of our discussion we assume that the jurisdictional requirements of secs. 6512 and 6514 are met so that we have jurisdiction to allow petitioner deductions in taxable years ending March 31, 1981 and 1982.↩